DETROIT BRANCH, NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE v CITY OF DEARBORN

Docket No. 95984. Submitted May 3, 1988, at Detroit. Decided December 19, 1988. Leave to appeal applied for.

The Detroit Branch of the National Association for the Advancement of Colored People, along with several others, brought an action in the Wayne Circuit Court against the City of Dearborn. Plaintiffs challenged the constitutionality of an ordinance adopted by defendant which, in part, limits the use of most of defendant's public parks to residents of the City of Dearborn or the guests of Dearborn residents, requires users of Dearborn parks to furnish proof of residency at the request of a law enforcement officer or a Dearborn Recreation Department employee, and provides that a violation of the ordinance constitutes a misdemeanor punishable by a fine not to exceed $500 or imprisonment up to ninety days or both. Following a bench trial, the court, Marvin R. Stempien, J., found that, with respect to Ford Woods Park and Crowley Park (Dearborn parks located near the City of Detroit and the City of Inkster, respectively), the challenged ordinance violated Const 1963, art 1, § 2 and that, with respect to all Dearborn parks, the ordinance violated Const 1963, art 1, § 11 and US Const, Am IV, which prohibit unreasonable searches and seizures. Defendant appealed.

The Court of Appeals *held:*

1. Const 1963, art 1, § 2, which provides that no person shall be denied the equal protection of the laws nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin, does not require implementing legislation in order to operate as a limitation on the exercise of governmental power.

2. Const 1963, art 1, § 2 goes beyond the limits of the

REFERENCES

Am Jur 2d, Civil Rights § 54.

Am Jur 2d, Constitutional Law §§ 735 *et seq.*

Am Jur 2d, Searches and Seizures §§ 2-6, 33.

Racial discrimination involving recreational facilities—Supreme Court cases. 29 L Ed 2d 1028.

Fourteenth Amendment by prohibiting all racial segregation, without regard to whether it was caused by a segregative purpose. Thus, it was not necessary for plaintiffs in this case to show a discriminatory purpose behind the challenged ordinance in order to prevail; a showing of discriminatory effect, i.e., that blacks would be excluded from Ford Woods Park and Crowley Park, was sufficient.

3. All seizures of a person, including those involving only a brief detention, fall within the protections afforded by the state and federal constitutional provisions concerning searches and seizures. A brief investigatory stop of an individual, like that which would be involved under the requirement of the challenged ordinance that a park user furnish proof of Dearborn residency, must either be justified by some objective manifestation, some articulable suspicion that the person stopped is, or is about to be, engaged in criminal activity, or be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of the detaining officers. The proof of residency requirement of the ordinance in this case violates Const 1963, art 1, § 11 and US Const, Am IV since a stop by a law enforcement officer or park employee, as authorized by the ordinance, cannot be justified in the manner described above. With regard to the trial court's ruling that other provisions of the ordinance would similarly constitute unreasonable search and seizure, a remand is necessary since the record does not disclose the court's analyses and reasons for finding those enforcement provisions unconstitutional.

Affirmed in part and remanded.

1. CONSTITUTIONAL LAW — EQUAL PROTECTION — CIVIL RIGHTS — LEGISLATION.

The provision of the Michigan Constitution which states that no person shall be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin does not require implementing legislation in order to operate as a limitation on the exercise of governmental power (Const 1963, art 1, § 2).

2. CONSTITUTIONAL LAW — RACIAL SEGREGATION.

The Michigan Constitution goes beyond the limits of the Fourteenth Amendment by prohibiting all racial segregation, without regard to whether it was caused by a segregative purpose (Const 1963, art 1, § 2; US Const, Am XIV).

3. CONSTITUTIONAL LAW — CIVIL RIGHTS — ACTIONS — INTENT.

An intent or purpose to discriminate need not be proven in an action brought under the provision of the Michigan Constitution which prohibits discrimination against any person on the basis of the person's religion, race, color or national origin (Const 1963, art 1, § 2).

4. CONSTITUTIONAL LAW — RACIAL DISCRIMINATION.

A municipal ordinance restricting the use of municipal parks to residents of the municipality and their guests violates the Michigan Constitution where the enforcement of the ordinance results in racial discrimination, i.e., the exclusion of members of a particular racial group (Const 1963, art 1, § 2).

5. SEARCHES AND SEIZURES — CONSTITUTIONAL LAW.

All seizures of a person, including those involving only a brief detention, fall within the protections afforded by the state and federal constitutional provisions concerning searches and seizures (US Const, Am IV; Const 1963, art 1, § 11).

6. SEARCHES AND SEIZURES — CONSTITUTIONAL LAW.

A brief investigatory stop of an individual must either be justified by some objective manifestation, some articulable suspicion, that the person stopped is, or is about to be, engaged in criminal activity, or be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of the detaining officers (US Const, Am IV; Const 1963, art 1, § 11).

7. SEARCHES AND SEIZURES — CONSTITUTIONAL LAW.

A municipal ordinance restricting the use of municipal parks to residents of the municipality or their guests and requiring park users to furnish proof of residency at the request of a law enforcement official or authorized park employee, a violation of which would constitute a misdemeanor, violates state and federal constitutional proscriptions against unreasonable searches and seizures where the ordinance sets no neutral criteria to ensure that the governmental intrusion is not the product of the detaining officer's unfettered discretion (US Const, Am IV; Const 1963, art 1, § 11).

*Goodman, Eden, Millender & Bedrosian* (by *William H. Goodman, Roderick V. MacNeal* and *Julie A. Gibson*), and *Horace E. Stone, Robert A. Sedler,* and *Patricia A. Streeter,* for plaintiffs.

*Butzel, Long, Gust, Klein & Van Zile* (by *Wil-*

liam M. Saxton, John B. Weaver and Leonard M. Niehoff), and William C. Hultgren, of Counsel, for defendant.

Amici Curiae:

Frank J. Kelley, Attorney General, Louis J. Caruso, Solicitor General, and Felix E. League and Dianne Rubin, Assistant Attorneys General, for Civil Rights Commission and Department of Civil Rights.

Before: GILLIS, P.J., and WAHLS and MURPHY, JJ.

WAHLS, J. Defendant, the City of Dearborn, appeals as of right from a decision of the Wayne Circuit Court which declared unconstitutional portions of a Dearborn ordinance restricting the use of most city parks by nonresidents. In its September 29, 1986, decision, the circuit court held that, regarding two specific Dearborn parks (Ford Woods Park and Crowley Park) certain portions of the ordinance (§§ 4, 5, 6 and 7) violated Const 1963, art 1, § 2, which prohibits racial discrimination against any individual while exercising his or her civil rights; and that, regarding all Dearborn parks, those same portions of the ordinance violated Const 1963, art 1, § 11 and US Const, Am IV, which prohibit unreasonable searches and seizures. As a result, the circuit court permanently enjoined the city from enforcing the challenged portions of the ordinance. Our examination of the issues presented in this appeal against the touchstones of both legal precedent and public policy convinces us that the circuit court's conclusions comport with the requirements of state and federal constitutional law. Accordingly, we affirm the result reached by the circuit court regarding the unconstitutionality of §§ 4, 5, 6 and 7 of the city

ordinance as applicable to Ford Woods Park and Crowley Park. In addition, we also affirm the result reached by the circuit court regarding the unconstitutionality of § 5 of the city ordinance as applicable to all parks in Dearborn, although we find it necessary to remand the case for the limited purpose of requiring the circuit court to state its reasons and analyses for finding §§ 4, 6 and 7 of the ordinance, as applied to all city parks, violative of state and federal protections against unreasonable seizures.

The record reveals that in November, 1985, an ordinance regarding municipal parks was adopted by the residents of Dearborn in a referendum vote. The ordinance, 85-330, consists of twenty-three sections which address matters such as hours of operation, picnic areas and camping use, consumption of alcoholic beverages, solicitation of contributions, merchandising of articles, and unlawful conduct. Relevant to the present appeal, however, are certain sections of the ordinance concerning the use of neighborhood parks by nonresidents or those who are not guests of city residents.[1] The challenged sections of the ordinance, §§ 4, 5, 6 and 7, provide as follows:

> SECTION 4. ADMITTANCE TO AND USE OF PARK FACILITIES: It being the stated purpose of this ordinance to ensure that all residents and their guests be granted free access and enjoyment of the parks; it is therefore recognized and declared that residents shall be given priority in the use of said parks and that in some instances, restrictions shall be placed on the use of parks, especially neighbor-

[1] The ordinance defines the term "neighborhood parks" as all city parks, public buildings, and recreation and playground areas except the parks and buildings located in the Town Hall Park, the Civic Center Park or Ford Field Park. Dearborn Ordinance 85-330, § 3(d)(ii), (iii). According to plaintiffs, this definition means that thirty-seven of the city's forty parks are subject to the ordinance.

hood parks, where unrestricted use of such facilities would result in exclusion of residents. Accordingly, the Director shall be responsible for implementing the stated purpose and is hereby given authority to implement such reasonable procedures as are necessary to ensure compliance with said purpose. In furtherance of said purpose, the Director shall:

(a) Establish a system of permits for use of the parks, or any of them, and for the use of park facilities; and require applications for such permits and prescribe forms therefor; and provide for the suspension or revocation of such permits for improper use of park facilities, untrue statements in applications for permits, improper use of permits, or other cause.

(b) Establish rules and regulations, not otherwise contained within this ordinance, for the orderly use of the parks and facilities and the establishment of fees and charges for the use of any park or facility.

(c) Restrict the use of any recreational facility or equipment so as to assure its reasonable availability to all persons, especially residents, using the park and desiring to use such recreational facility or equipment.

(d) *Restrict the use of neighborhood parks to use by residents* [2] *and their guests only.*

(e) Erect appropriate signage at neighborhood parks designed to notify all persons using said facilities of the use restrictions contained within this ordinance. At a minimum, said signs shall read: "Dearborn Residents and Guests Only. Identification must be produced when requested."

SECTION 5. PRODUCTION OF IDENTIFICATION: No person in a park who claims to be a resident shall refuse or fail to produce and exhibit adequate identification proving residency upon the request of any law enforcement officer or authorized Recreation Department employee who wishes to inspect

---

[2] The ordinance defines the term "resident" as "a person who owns or rents a residential unit within the corporate limits of the City of Dearborn." Dearborn Ordinance 85-330, § 3(g).

the identification for the purpose of determining that the provisions of this ordinance have been complied with. Adequate identification shall consist of a driver's license, voter's registration card, school identification card, Secretary of State identification card or special permit issued by the City Clerk or Director of Recreation.

SECTION 6. PERMITS REQUIRED. In addition to any other provision of this ordinance that requires the obtaining of a permit prior to engaging in a given activity, no person in a park shall conduct, operate, present, manage or take part in any of the following activities unless a permit is obtained prior to the start of the activity upon such terms and conditions as may be established by the Director:

(a) Any picnic, outing or gathering sponsored by any person, organization, club, business or group composed of 20 or more persons.

(b) Any organized sports activity, contest, exhibit, dramatic performance, play, motion picture, radio or television broadcast, fair, circus, musical event, or any similar event.

(c) Any public meeting, assembly or parade, including, but not limited to drills, maneuvers, ceremonies, addresses, speeches, or political meetings.

(d) Any use of any park facility by a certain person or group of persons to the exclusion of others.

(e) The use of public swimming pools shall be restricted to residents and their guests only, under a permit system established by the Director. Only one guest shall accompany a resident at any one time and residents under the age of 18 years shall not be permitted to sponsor a guest's use of a public swimming pool.

SECTION 7. PRODUCTION OF PERMITS: No persons in a park shall refuse or fail to produce and exhibit any permit he claims to have upon the request of any law enforcement officer or authorized Recreation Department employee who wishes to inspect the permit for the purpose of determining that the

provisions of this ordinance have been complied with. [Emphasis added.]

In addition, § 21 states that any person convicted of violating any provision of the ordinance "shall be guilty of a misdemeanor, and . . . shall be fined in any sum not exceeding five hundred dollars, or [shall be punished with] imprisonment up to ninety days, or both."

In December, 1985, plaintiffs, the Detroit Branch of the National Association for the Advancement of Colored People and five individuals, filed a complaint against the City of Dearborn. After the circuit court granted summary disposition under MCR 2.116(C)(10) to the city on three of plaintiffs' claims,[3] trial was scheduled for plaintiffs' remaining two claims.

The remaining two claims which survived the city's motion for summary disposition and which ultimately formed the basis of the trial in the present case concerned (1) whether §§ 4, 5, 6 and 7 of the city's ordinance discriminated against black persons in violation of art 1, § 2 of the Michigan Constitution, which provides:

No person shall be denied the equal protection

[3] Regarding the three claims which formed the basis of the grant of summary disposition in favor of the city, the circuit court ruled that (1) the constitutional grant of power to home-rule cities, as found in the Michigan Constitution, Const 1963, art 7, §§ 21, 22 and 23, and the implementation of that power in the Home Rule Cities Act, MCL 117.1 et seq.; MSA 5.201 et seq., granted plenary authority to home-rule cities to restrict the use of municipal parks to city residents; (2) a city holds its park properties as trustee not for the citizens of the entire state but for its own residents, Schneider v City of Grand Rapids, 211 Mich 399, 403; 179 NW2d 285 (1920); and (3) because the ordinance excludes all nonresidents, and therefore treats all such persons equally, it does not discriminate against a "suspect class" for purposes of the protections afforded to all persons under the equal protection clause, Const 1963, art 1, § 2; US Const, Am XIV; San Antonio School Independent Dist v Rodriquez, 411 US 1; 93 S Ct 1278; 36 L Ed 2d 16 (1973); Manistee Bank & Trust Co v McGowan, 394 Mich 655; 232 NW2d 636 (1975).

of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

and (2) whether §§ 4, 5, 6 and 7 of the city's ordinance affected park users in violation of the Fourth Amendment to the United States Constitution and the analogous provision in art 1, § 11 of the Michigan Constitution, which provides:

The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state.

At the trial on these two issues, Michael Guido, the mayor of Dearborn since January 1, 1986, was called as the first witness. Mayor Guido, noting that several options for enforcement of the ordinance were being considered, testified that rules for implementing the ordinance "are being developed and have been sent to [the City] Council for review." Enforcement by way of fencing the neighborhood parks, he stated, would cost approximately three-quarters of a million dollars. It was also disclosed that the present city administration as well as its predecessor opposed the adoption of the challenged provisions of the ordinance.

Vera Ventre, a fifty-two-year resident of Dear-

born and the president of the Ford Woods Association, testified that complaints had been received from Dearborn residents that the facilities in Ford Woods Park, which is one of the city's largest parks and is located near the Dearborn-Detroit border, were being used by nonresidents, thereby precluding their use by residents at certain times. She testified regarding complaints that residents were being intimidated at the park's swimming pool by nonresidents, that baseball diamonds were too often filled, and that buses from day-care centers outside of Dearborn were bringing children to use the park's facilities. According to Ventre, the Ford Woods Association voiced its complaints to a city council member who, in the spring of 1985, drafted the ordinance now at issue. David Vaseau, an eighteen-year Dearborn resident and also a member of the Ford Woods Association, stated that the complaints regarding the use of Ford Woods Park by nonresidents had begun in 1980. He also stated that lawsuits against the city had been filed by nonresidents for injuries sustained in the park. Paul Brian Maxwell, an employee from 1978 to 1985 at Ford Woods Park, testified that he had at times received complaints in racially derogatory language from white adults that black individuals were using the park's swimming pool and basketball courts.

Charles Lewis, a past president of the National Recreation Park Ethnic Minority Society and the superintendent of recreation for the City of Detroit with approximately four hundred Detroit parks under his immediate supervision, testified that, although there were numerous Detroit parks within a two-mile radius of Dearborn's Ford Woods Park, closing the latter park to nonresidents, or closing Dearborn's Crowley Park, which is adjacent to the City of Inkster, would deprive nonresi-

dents living near those Dearborn parks of an opportunity to enjoy a quality recreational experience. Robert G. Newby, who worked for 2½ years as a regional director of the Michigan Civil Rights Commission in Battle Creek and who received a Ph.D. degree in race relations from Stanford University, opined that the city's ordinance would have a negative effect on the racial attitudes of both black and white individuals.

During trial, plaintiffs were permitted to amend their complaint to include a count that the ordinance was inconsistent with the public recreation fund act, MCL 318.371 *et seq.*; MSA 13.1098 (71) *et seq.* All projects funded under that act must be open to the general public of the state. MCL 318.382; MSA 13.1098(82). On this issue the circuit court ruled, in a separate opinion, that the act precluded the application of the ordinance to neighborhood parks financed by the city under the act. That decision was not appealed.

Ultimately, the circuit court, in a seventeen-page decision issued on September 29, 1986, ruled that, regarding Ford Woods Park and Crowley Park, §§ 4, 5, 6 and 7 of the city's ordinance violated art 1, § 2 of the Michigan Constitution, which prohibits racial discrimination against any individual while exercising his or her civil rights, and that, regarding all Dearborn Parks, §§ 4, 5, 6 and 7 of the ordinance violated art 1, § 11 of the Michigan Constitution and the Fourth Amendment to the United States Constitution, which prohibit unreasonable searches and seizures. On appeal, the city argues that the circuit court erred in finding any unconstitutionality in the ordinance. We disagree.

First, the city contends that the circuit court erred in failing to dismiss plaintiffs' claim brought under art 1, § 2 of the Michigan Constitution, as

requested by the city at the close of its proofs, because the claim "does not state a claim on which relief could be granted." The city especially emphasizes that the constitutional provision itself, while prohibiting racial discrimination against any person while exercising his or her civil rights, specifically states that "[t]he legislature shall implement this section by appropriate legislation." Based on this language, the city reasons that the constitutional provision itself is not self-implementing and that, since no implementing legislation exists defining, for example, "civil rights" and "person" as used in the provision, neither plaintiffs nor anyone else could properly state a claim grounded on art 1, § 2.

Although art 1, § 2 apparently is not self-implementing against private parties, *Pacheco v Clifton,* 109 Mich App 563, 576; 311 NW2d 801 (1981), modified on other grounds 429 Mich 308; 362 NW2d 642 (1984), we believe that it is so against governmental entities. It is a firmly established doctrine that rights guaranteed by a constitution are drawn to restrict governmental conduct and to provide protection from governmental infringement and excesses. *Woodland v Michigan Citizens Lobby,* 423 Mich 188, 204-205; 378 NW2d 337 (1985). Article 1, § 2 is the only provision in the Michigan Constitution's declaration of rights to impose an affirmative obligation on the Legislature for implementation by appropriate legislation. This was accomplished, regarding private parties, in the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548 (101) *et seq.* As noted by the Supreme Court in *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation,* 425 Mich 173, 186; 387 NW2d 821 (1986), "[i]t is without doubt . . . that the Civil Rights Act is intended to enlarge the scope of civil rights beyond the state

action limitation of art 1, § 2 of the Michigan Constitution to cover nongovernmental conduct in the handling of public accommodations." We find that, like all the other provisions of the Michigan Constitution protecting individual rights, art 1, § 2 does not require implementing legislation in order to operate as a limitation on the exercise of governmental power.

Second, the city contends that the circuit court erred in ruling that art 1, § 2 of the Michigan Constitution provides broader protection to individuals than does the state or federal equal protection clause. In essence, the city detects error in the circuit court's conclusion that "[r]elief may be accorded for discrimination under Article I, Section 2 . . . without proof of an intent or purpose to discriminate" so that "public action which is on its face racially neutral, may be prohibited because its effect . . . is racially discriminatory."

It has been held that, "[i]n the absence of a purpose to cause racial discrimination, governmental action that has a disproportionate effect on a racial minority is not unconstitutional" under the state or federal equal protection clause. *People v Ford,* 417 Mich 66, 103; 331 NW2d 878 (1982); *Arlington Heights v Metropolitan Housing Development Corp,* 429 US 252, 265; 97 S Ct 555; 50 L Ed 2d 450 (1977). Rather, in such cases, a racially discriminatory purpose underlying the governmental activity must be shown before unconstitutionality may be declared. *Id.* In the instant case, the circuit court was careful to state, both at trial and in its written decision, that the intent of the electorate in adopting the ordinance was not a proper subject for judicial inquiry and that, moreover, it found "no evidence in the record of this case of any present official policy of the current city administration that is constitutionally suspect

because of race." Nevertheless, the court found as a matter of fact that §§ 4, 5, 6 and 7 of Dearborn Ordinance 85-330 "have an unlawfully disparate effect on those black citizens of Michigan who are potential users within the geographic and population service areas of Frod [sic] Woods Park and Crowley Park," and that such "disparate effect" constituted a violation of art 1, § 2 of the Michigan Constitution. On appeal, the city argues that the court erred in determining that, as a matter of law, disparate effect, and not discriminatory purpose, was the appropriate standard for testing the constitutionality of the city's ordinance under art 1, § 2. In other words, the city maintains that the same standard used in equal protection cases regarding challenges to governmental activity on the basis of race should be employed in art 1, § 2 cases regarding challenges to governmental activity on the basis of racial discrimination to individuals exercising their civil rights.

In rejecting the city's argument on this issue, the circuit court relied on *Berry v School Dist of the City of Benton Harbor,* 467 F Supp 721, 730-732 (WD Mich, 1978). We do the same.

In *Berry,* Chief Judge Fox, describing the portion of art 1, § 2 concerning discrimination as an "anti-discrimination" clause, concludes that the plain wording of the clause indicates that the drafters of the Michigan Constitution intended that art 1, § 2 should provide greater protection than that afforded by the constitutional guarantee of equal protection under the law. Accordingly, he deduces that the discriminatory intent or purpose which must be demonstrated in equal protection cases need not be proved in cases brought under art 1, § 2. Rather than restate or paraphrase Chief Judge Fox's opinion on this issue, we believe it

would not be inappropriate here to quote *ipsissima verba*:

> It is plainly evident that Article I, section 2 of the Michigan Constitution go[es] beyond the limits of the Fourteenth Amendment by prohibiting all racial segregation, without regard to whether it was caused by a segregative purpose.[4]
>
> This court recognizes that a state constitution may be more liberally construed than the federal Constitution, and this has oftentimes been done, especially in the area of individual rights. Justice William Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489 (1977). The basis for this court's interpretation is found in the plain wording of the Michigan Constitution. Article I, section 2, provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be *discriminated against* in the exercise thereof because of religion, race, color or national origin." (Emphasis supplied.) . . . [This] provision prohibits discrimination; the words "discriminate," "discrimination" and "non-discrimination" are words that do not appear in the Fourteenth Amendment, and it is clear that the drafters of the Michigan Constitution, by the use of these words, intended that the Michigan Constitution was to have a broader reach than the Fourteenth Amendment.
>
> The drafters' intent can best be seen in Article I, section 2, which, in part, tracks the Fourteenth Amendment by providing that no person is to be denied the equal protection of the laws; however, it goes beyond this and further proclaims that no person is to be discriminated against. This clearly indicates that discrimination and equal protection of the laws are two different concepts under the Michigan Constitution, and thus when a court relies on the anti-discrimination clause it should not be guided by the traditional equal protection analysis. Instead, this court chooses to rely on the plain wording of Article I, section 2, . . . [in which

it does not] state that an intent or purpose to discriminate must be proven before liability can be imposed, for that would defeat the clear, plain intent of the drafters proclaimed on August 1, 1963.

\* \* \*

If this court were to read an intent requirement into the anti-discrimination [clause] of Article I, section 2, . . . it would violate basic principles of constitutional interpretation which require that this court give effect to the plain meaning of the words used in the constitutional provision, as these words were understood by the people who adopted the Constitution. *Bond v Ann Arbor School District,* 383 Mich 693, 699; 178 NW2d 484 (1970). The plain meaning of the word "discrimination" is "a showing of partiality or prejudice in treatment, . . . action or policies directed against the welfare of minority groups." Second College Edition, Webster's New World Dictionary of the American Language.

---

[4] . . . These cases are further distinguishable because the court of appeals, in construing the Michigan Constitution, relied on decisions from federal courts which construed the Fourteenth Amendment. See, *Bell v School City of Gary, Indiana,* 324 F2d 209 (CA 7, 1963), *cert den,* 377 US 924; 84 S Ct 1223; 12 L Ed 2d 216 (1964); *Henry v Godsell,* 165 F Supp 87 (ED Mich, 1958). These federal cases are inapplicable, however, because they did not involve the Michigan Constitution. The Michigan Constitution distinguishes between equal protection under the law and discrimination. The proper approach would have required that the court of appeals attempt to do what this court has done and rely on the intent of the drafters in interpreting the Michigan Constitution.

---

Moreover, defendant's reliance in its appellate brief on *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation, supra,* for the proposition that the Michigan Supreme Court has held that the antidiscrimination clause of art 1, § 2 "provides no broader protection than does the traditional standard of the 'equal protection' clause," is misplaced. The *Waterford*

*Twp* case does not involve determining the appropriate standard under the antidiscrimination clause of art 1, § 2, but, rather, the interpreting of a statutory provision in light of a similar constitutional provision. Thus, the Supreme Court considered the relationship between the protection against gender discrimination provided by the equal protection clause of art 1, § 2, and the protection against gender discrimination provided by § 302(a) of the Civil Rights Act, concluding that "the use of the words 'full and equal enjoyment' in the statute was intended to grant a higher standard of substantive equality than the constitutional minimum required by the words 'equal protection.'" 425 Mich 186. We do not view the *Waterford Twp* case as controlling or deciding the constitutional issue now before us and discussed by Chief Judge Fox in *Berry.*

The final issue raised on appeal by the city concerns the method of enforcement of the ordinance's nonresident provisions. The city's appellate brief on this issue seems to concern §§ 4, 5, 6 and 7 of the ordinance, although § 5 receives the only explicit and detailed treatment. That section, excerpted above, permits any law enforcement officer or authorized recreation department employee to require a park user to stop and produce identification proving Dearborn residency. The circuit court, in its analysis of this issue, found that park users had a reasonable expectation of privacy while using a Dearborn park which would be violated by the implementation of § 5—a section described by the court as allowing governmental personnel "to exercise totally unguided discretion as to when and where stops would be made, and as to whom they would stop." We note that, although the circuit court focused its analysis and discussion of this issue on § 5, nonetheless, in the last

page of its decision it finds not only § 5, but also §§ 4, 6 and 7, "void as applied to any park in the City of Dearborn, being in violation of Article I, Section 11, of the Michigan Constitution, and of Amendments 4 and 14 of the U. S. Constitution." Thus, the court enjoined the city from enforcing "the non-resident provisions of Sections 4, 5, 6 and 7 of the ordinance in any park in the City of Dearborn." Our perusal of §§ 4, 5, 6 and 7 suggests that only § 5 lends itself to a challenge on the basis of state and federal seizure law. However, since the circuit court's opinion focuses solely on § 5 but includes §§ 4, 6 and 7 in its ruling, we find it necessary to remand the case for the limited purpose of requiring the trial court to state its reasons and analyses for finding the three latter sections of the ordinance violative of art 1, § 11 of the Michigan Constitution and the Fourth Amendment to the United States Constitution. Therefore, our present discussion regarding enforcement of the ordinance's nonresident provisions—similar to the circuit court's discussion in its September 29, 1986, opinion and to the city's treatment of this issue in its appellate brief—will specifically address only § 5.

All seizures of a person, including those involving only a brief detention, fall within the protections afforded by the state and federal constitutional provisions concerning searches and seizures. *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968); *People v Shabaz,* 424 Mich 42; 378 NW2d 451 (1985), cert dis — US —; 106 S Ct 3326; 92 L Ed 2d 733 (1986). Even a brief investigatory stop of an individual must either be justified by some objective manifestation, some articulable suspicion, that the person stopped is, or is about to be, engaged in criminal activity, or be carried out pursuant to a plan embodying explicit, neutral

limitations on the conduct of the detaining officers. *Id., Brown v Texas,* 443 US 47, 51; 99 S Ct 2637; 61 L Ed 2d 357 (1979).

It is apparent that a Dearborn park user's residency cannot be divined by a police officer, authorized recreation department employee, or anyone else based merely on the user's appearance. Thus, a user could not be detained based on an articulable suspicion that he or she entered the park in violation of the nonresident provisions of ordinance 85-330. Moreover, it is just as clear that § 5 of the ordinance enunciates no plan embodying explicit, neutral limitations on the conduct of detaining personnel. Indeed, quite to the contrary, § 5 empowers any law enforcement officer or authorized recreation department employee to stop a park user and demand to be provided with the user's identification if such officer or employee "wishes to inspect the identification for the purpose of determining that the provisions of this ordinance have been complied with." Absolutely no neutral criteria are set forth in the ordinance to ensure that the governmental intrusion is not the product of the detaining personnel's unfettered discretion; absolutely no objective standards are provided in the ordinance to warrant that the governmental intrusion is not the product of the detaining personnel's unlimited and unguided "wish."[4] We agree with the circuit court that such an infirmity in the text of the ordinance itself constitutes a fatal flaw when examined in light of

---

[4] We note that, during the circuit court proceedings and on appeal, plaintiffs conceded that fencing the city's parks and requiring all users to display identification of residency at the point of entry would constitute a constitutionally acceptable method of enforcing the ordinance's nonresident provisions. In their appellate brief, plaintiffs comment that "[t]here is nothing to prevent the City from enacting a new ordinance with a constitutionally permissible method of enforcement."

the constitutional injunction against unreasonable searches and seizures. Accordingly, we also agree with the circuit court's finding that "the stopping of park users in the City of Dearborn neighborhoods on no basis other than the *wish* and the *request* of the officer making a stop fails to meet the constitutional requirement that the nature of the intrusion be objective." (Emphasis in original.)

Affirmed in part and remanded for the limited purpose of requiring the circuit court to state its reasons and analyses for finding §§ 4, 6 and 7 of the ordinance violative of state and federal seizure protections as applied to all Dearborn parks.