PEOPLE v BARKER

Docket No. 87039. Argued December 5, 1990 (Calendar No. 9). Decided April 22, 1991.

Stacey Barker was convicted by a jury in the Oakland Circuit Court, Fred M. Mester, J., of first-degree murder. The Court of Appeals, Sullivan, P.J., and Sawyer, J. (Marilyn J. Kelly, J., concurring), affirmed in an opinion per curiam (Docket No. 106265). The defendant seeks leave to appeal to determine whether the trial judge erred in refusing to instruct the jury that she was entitled to use deadly force to resist a sexual assault.

In a memorandum opinion, signed by Chief Justice Cavanagh and Justices Brickley, Boyle, Riley, and Griffin, the Supreme Court *held:*

The trial court did err, but the error was harmless.

Upon request, and where there is a sufficient evidentiary basis, a court must instruct the jury that force, including deadly force, may be used to repel an imminent forcible sexual penetration. In this case, there was both a request and an evidentiary basis for such an instruction, and it should have been given. Although the trial court erred in failing to so instruct the jury, the error was harmless. No reasonable juror would have believed the defendant's claim of self-defense.

Affirmed.

Justice Levin, dissenting, stated that the trial court erred in failing to instruct the jury that the defendant was justified in using force, including deadly force, if she honestly and reasonably believed that it was necessary to use such force to repel an imminent forcible sexual penetration, but the error was not harmless. It properly cannot be said that no reasonable juror would have believed that the victim sexually assaulted the defendant or that an instruction that the defendant could use deadly force to prevent oral sexual advances may not have resulted in acquittal, conviction of a lesser offense, or another mistrial.

Justice Mallett took no part in the decision of this case.

179 Mich App 702; 446 NW2d 549 (1989) affirmed.

*Frank J. Kelley,* Attorney General, *Gay Secor*

*Hardy,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, *Michael J. Modelski,* Chief, Appellate Division, and *Richard H. Browne,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Gail Rodwan*), for the defendant.

Amicus Curiae:

*Mogill, Posner & Cohen* (by *Marjory B. Cohen*) for the Women Lawyers Association of Michigan.

MEMORANDUM OPINION. In this case we granted leave to appeal to determine "whether the trial judge erred reversibly by refusing to instruct the jury that the defendant was entitled to use deadly force to resist a sexual assault. Cf. *People v [Heflin]*, 434 Mich 482 [456 NW2d 10] (1990)." 435 Mich 867 (1990). After considering this matter, we are persuaded that the trial court did err, but that the error was harmless. We therefore affirm the judgments of the Court of Appeals and the Oakland Circuit Court.

This defendant has been convicted of first-degree murder. MCL 750.316; MSA 28.548. The Court of Appeals has summarized the facts:

Briefly, the victim was an eighty-one-year-old white male and retired Lutheran minister. He suffered from various physical ailments and relied on a cane to walk. Defendant is a young, black woman who worked as a companion to another resident in the same apartment complex as the victim. Defendant and the victim were acquainted and defendant was present at the victim's apartment on the evening of his death. Defendant admits to killing the victim, but claims that she did so in self-defense. Specifically, defendant claims that the victim started to make sexual advances

towards her and would not stop even when she resisted. According to the medical examiner, the victim suffered ten blows to the head with a blunt instrument and approximately thirty-two stab wounds to the back. In a statement to the police during the investigation, defendant indicated that her reaction and the extent of her conduct in defending herself was in part a result of her having been previously raped and the fear of it happening again. [179 Mich App 702, 704-705; 446 NW2d 549 (1989).]

Using the standard instruction, the trial court instructed the jury that the defendant could defend herself from death or "serious bodily harm" with force, "even to the extent of taking a human life if necessary." See CJI 7:9:01, now CJI2d 7.15. However, the trial court refused the defendant's timely request that the standard self-defense instruction be modified so that the jury would be specifically informed that deadly force may be used to resist a "sexual assault."[1]

We addressed this issue in *People v Heflin*, 434 Mich 482; 456 NW2d 10 (1990), reh den 435 Mich 1203 (1990). This Court's opinions contained varying formulations of the precise basis and extent of a court's obligation to give such an instruction. However, a majority of us were in agreement that, upon request and where there is a sufficient evidentiary basis, a court must instruct the jury that force, including deadly force, may be used to repel an imminent forcible sexual penetration.[2] *Id.,* pp

[1] The term "sexual assault" may mean a variety of things, including sexual activity which contemplates something less than forcible sexual penetration. Here, the defendant testified concerning actions of the deceased, and stated that these actions caused her to fear that he would rape her, i.e., that he would force her to engage in sexual penetration. Defense counsel's generalized request was grounded in that evidentiary basis.

[2] As with any use of deadly force, defendant's belief must be both honest and reasonable.

502-503, 509-515, 527-530, 551-567. In the present case, there was both a request and an evidentiary basis for such an instruction, and it should have been given.

Although the trial court erred when it failed to instruct the jury correctly with regard to the use of deadly force, the error was harmless for the reasons stated in the concurring opinion in the Court of Appeals. 179 Mich App 710-711. The decedent was eighty-one years old, walked with a cane, and was described as being unsteady on his feet. The defendant is in her early twenties, five feet, seven inches tall, and weighs 170 pounds.

The evidence thoroughly contradicted the defendant's version of how and why she killed the elderly and infirm victim. We agree with Judge MARILYN KELLY's concurring opinion in the Court of Appeals that, on this record, no reasonable juror would have believed the defendant's claim of self-defense.

> Defendant bludgeoned the deceased ten times and stabbed him thirty-two times. Some of the wounds appeared to have been inflicted while he attempted to crawl away. . . . [N]o reasonable juror could have believed such force was necessary to prevent rape by the enfeebled deceased. [*People v Barker,* 179 Mich App 702, 711 (KELLY, J., concurring).]

For these reasons, we affirm the judgments of the Court of Appeals and the Oakland Circuit Court.

CAVANAGH, C.J., and BRICKLEY, BOYLE, RILEY, and GRIFFIN, JJ., concurred.

LEVIN, J. (*dissenting*). I concur in the conclusion that the trial court erred in failing to instruct the

jury that Stacey Barker was justified in using "force, including deadly force" if she honestly and reasonably believed that it was necessary to use such force "to repel an imminent forcible sexual penetration."[1]

I dissent from the Court's disposition because I do not agree that the error was harmless, either for the reasons stated in the concurring opinion in the Court of Appeals,[2] or for the reasons stated in the memorandum opinion.

The evidence suggests that there was, and is consistent with, a sudden affray. Barker assaulted

[1] *Ante,* p 163.

[2] *People v Barker,* 179 Mich App 702, 710-711; 446 NW2d 549 (1989).

The memorandum opinion states that in *People v Heflin,* 434 Mich 482; 456 NW2d 10 (1990), "a majority of us were in agreement that, upon request and where there is a sufficient evidentiary basis, a court must instruct the jury that force, including deadly force, may be used to repel an imminent forcible sexual penetration. *Id.,* pp 502-503, 509-515, 527-530, 551-567." *Ante,* pp 163-164.

The references to pp 527-530 are to a dissenting opinion, and the references to pp 551-567 are to another dissenting opinion.

The references to pp 502-503 are to the opinion in *Heflin* rather than to the opinion in the companion case of *People v Landrum* (signed by two of the justices with two others concurring in the result only), reported sub nom as *People v Heflin.* It was in the portion of the opinion addressing *Landrum's* appeal that the issue was dealt with on pp 509-515 of the lead opinion as follows:

> Rather than specify each and every statutory definition of criminal sexual conduct that would mandate an instruction regarding self-defense, we would hold that a person may use deadly force in self-defense to repel a criminal sexual assault when confronted with force that the person reasonably believes could result in imminent death or serious bodily harm. This instruction addresses the delicate balance between the well-established doctrine of self-defense on the one hand, and the extremely egregious and personally intrusive crime of criminal sexual conduct on the other. Accordingly, we would hold that a trial court should instruct the jury that a person may use deadly force in self-defense to repel a criminal sexual assault when confronted with force that the person reasonably believes could result in imminent death or serious bodily harm. [*Id.,* pp 512-513.]

Frank Madsen with impromptu weapons; first with a statuette that she obtained from the top shelf of furniture in the foyer of Madsen's apartment and then, after the struggle continued in the kitchen, with a kitchen knife.

This Court should not lightly assume that an eighty-one-year-old man does not have sexual interests, and is incapable of being aroused by and making a sexual assault on a younger woman:

> In general, there is no reason why healthy older people cannot continue to enjoy sex until almost the very end. A man, despite a lowered sperm count, is still capable of fathering children even into his eighties . . . . [Rosenfeld, *Prolongevity II* (New York: Alfred A. Knopf, 1985), p 177.]

> Although sperm production slows down after age forty, it continues into the eighties and nineties. [Masters, Johnson & Kolodny, *Human Sexuality* (Boston: Little, Brown & Co, 1982), p 170.]

It cannot properly be said that no reasonable juror would have believed that Madsen made a sexual assault on Barker. Nor can it properly be said that an instruction that Barker could use deadly force to prevent oral sexual advances— Barker's lawyer spoke of Madsen seeking to lick Barker's body—may not have resulted in acquittal, conviction of a lesser offense, or another mistrial because all twelve jurors were unable to agree on a verdict.

I

As set forth in the memorandum opinion, Barker requested an instruction that deadly force

may be used to resist a "sexual assault."[3] The
memorandum opinion states that Barker was enti-
tled to an instruction "that force, including deadly
force, may be used to repel an imminent forcible
sexual penetration."[4]

The memorandum opinion does not state that a
judge should instruct the jury with respect to what
the term "sexual penetration" means. Judges may
therefore read the memorandum opinion either as
not requiring, or not permitting, an instruction in
that regard. It should be made clear that the
instruction should generally state that "sexual
penetration" includes not only vaginal intercourse,
but also "cunnilingus, fellatio, anal intercourse, or
any other intrusion, however slight, of any part of
a person's body or of any object into the genital or
anal openings of another person's body,"[5] and that
emission of semen is not required.

[3] *Ante*, p 163. While Barker claimed that she was fearful of being
raped, and hence, fearful that Madsen was seeking sexual penetra-
tion, her lawyer suggested, in requesting the instruction in terms of
"sexual assault," that Madsen may have been seeking oral sexual
contact.

[4] *Ante*, p 163. The substitution of "penetration" for "assault" sug-
gests that the majority is of the opinion that such an instruction may
not be required where the defendant fears "imminent" intentional
touching of her "intimate parts" even though she honestly and
reasonably believes nothing less than deadly force will prevent such
touching.

The terms "sexual contact" and "sexual penetration" are defined in
the Penal Code as follows:

> (k) "Sexual contact" includes the intentional touching of the
> victim's or actor's intimate parts or the intentional touching of
> the clothing covering the immediate area of the victim's or
> actor's intimate parts, if that intentional touching can reason-
> ably be construed as being for the purpose of sexual arousal or
> gratification.
>
> (l) "Sexual penetration" means sexual intercourse, cunnilin-
> gus, fellatio, anal intercourse, or any other intrusion, however
> slight, of any part of a person's body or of any object into
> the genital or anal openings of another person's body, but
> emission of semen is not required. [MCL 750.520a(k), (l); MSA
> 28.7881(1)(k), (l).]

[5] See n 4.

II

The judge who filed the concurring opinion in the Court of Appeals said that Barker "bludgeoned the deceased ten times and stabbed him thirty-two times. Some of the wounds appeared to have been inflicted while he attempted to crawl away."[6] The judge said that although the jurors were not told that Barker "was entitled to use deadly force, no reasonable juror could have believed such force was necessary to prevent rape by the enfeebled deceased." *Id.*

While the prosecutor argued that Frank Madsen was crawling away, the medical examiner testified that he was unable to determine whether the assailant, Barker, was standing behind, in front of, or at the side of Madsen when the wounds were inflicted. Barker testified that, rather than crawling away, Madsen continued to assault her after she struck him on the head with the statuette, and followed her into the kitchen. And it was for that reason that she picked up a kitchen knife, and, in a frenzy, stabbed him as many times as she did.

A woman who cleaned Madsen's apartment every day, and who discovered Madsen's body, described him as "a strong man, a big man."

It was for the jurors, and not for the judges of the Court of Appeals or for the justices of this Court, to decide whether Madsen was attempting to crawl away or was continuing a sexual assault when he was stabbed. It was also the function of the jurors, and neither our function nor that of the Court of Appeals, to decide—if the jurors found that Madsen had initiated and persisted in a sexual assault—the extent to which he was enfee-

6 179 Mich App 702, 711; 446 NW2d 549 (1989).

bled, and the force Barker honestly and reasonably believed to be necessary to prevent a continuation of the sexual assault.

If the jurors concluded, in agreement with the concurring Court of Appeals judge, that deadly force was not needed to prevent rape, they might nevertheless, if properly instructed that Barker was entitled to use deadly force if she honestly and reasonably believed that a sexual assault/forcible sexual penetration was imminent, have found her guilty of a lesser offense than first-degree murder. Thus, even if none of the jurors " 'believed such [deadly] force was necessary to prevent rape by the enfeebled deceased,' "[7] one or more of the jurors, if so properly instructed, might have reasonably concluded—as we are advised one juror did in the first trial[8]—that Barker was guilty of the lesser offense of manslaughter.

### III

The majority does not state the basis for the conclusion set forth in the memorandum opinion that the "evidence thoroughly contradicted the defendant's version of how and why she killed the elderly and infirm victim."[9]

The constitution provides:

> Decisions of the supreme court, including all decisions on prerogative writs, shall be in writing and shall contain a concise statement of the facts and reasons for each decision and reasons for each denial of leave to appeal. When a judge dissents in whole or in part he shall give in writing the reasons for his dissent. [Const 1963, art 6, § 6.]

---

[7] *Id.,* p 711. See *ante,* p 164, for text.

[8] We are also advised that the other eleven were prepared to convict Barker of an offense other than first-degree murder.

[9] *Ante,* p 164.

The majority does not state the facts, other than to repeat the summary provided by the majority in the Court of Appeals. The majority in the Court of Appeals did not, however, predicate affirmance on harmlessness of instructional error, but rather on its conclusion that there was no instructional or other error. Accordingly, the factual narration provided by the Court of Appeals did not focus on the asserted harmlessness of the error.

Barker, her counsel, bench and bar, and the public at large are left to wonder what evidence the majority has in mind in stating that the evidence thoroughly contradicted Barker's version of how and why she killed Madsen. The majority's conclusory statement does not comply with the constitutional requirement obliging the Court to provide a concise statement of the facts and the reasons for decision.

IV

Madsen's daughter testified that her father was an affectionate man, and that women had called him a "great kisser."

Madsen's wallet was found in his apartment containing $61 in cash[10] and a card with Barker's telephone number written on it. A woman testified that in October, 1986, she was working in a Bennigan's restaurant in Southfield and observed Barker having dinner with an elderly gentleman who walked with a cane. She said that the two were

---

[10] There was testimony that Madsen withdrew $200 from his checking account approximately one week before his death on November 5, 1986. A friend of forty years testified that she observed Madsen two days before his death with $300 in cash.

A detective testified that a desk drawer in Madsen's bedroom was partially open, with a ledger book and $8 in Canadian money inside the drawer in plain view. There was no blood on the drawer or its contents, nor was there blood on the wallet.

acting "like a young couple, like girlfriend and boyfriend . . . ."

A detective testified that Barker told him that she met Madsen while working for another resident and that they became friends. He invited her to his apartment a number of times, and they went out to lunch and dinner. On another occasion, he paid her for cleaning his apartment.

Barker told the detective that on November 5, Madsen telephoned her and asked her to visit him. They began the evening watching television. He came over on the couch where Barker was and started touching her. "I just started laughing[.] I said, Frank, what are you doing because he had told me that he was impotent."[11]

Barker's aunt and a number of women in the complex where Madsen lived had told her that she should stay away from Madsen "because he was a dirty old man, but I felt like he was just nice and he just needed company." She was not concerned about him trying to sexually approach her, because he had never tried, and he had told her that he was impotent.

This night, he kept pulling on her clothes, telling her he just wanted to touch her:

> [H]e just wanted to look at me and I kept trying to laugh it off and tell him, no, would you stop, you're being bad and he was telling me, you know, that he had been taking me out to dinner, spending money on me, buying me things and giving me money and he had been with me, you know, he had been seeing me for a long time and it was about time I started being nice to him. So I said, Frank, I'm always nice to you and the whole time this was going on he was just laughing and smiling you know, like it was a joke and I kept telling him

---

[11] The friend of forty years (see n 10) testified that two and one-half years before his death, Madsen told her that he was impotent.

he was scaring me and to please stop and then he didn't.

\* \* \*

And, you know, he started scaring me because he seemed like he was trying to take advantage of me, but he was laughing so it was like he was joking with me. So I kept saying, Frank, would you please stop, just stop, so I got up and I started walking towards the door. I was just gonna leave because I didn't want him pawing all over me and then he came behind me and he was grabbing me, telling me he wasn't gonna let me go and I really got scared because I had been raped before and I had to see a rape counselor and I just didn't want it to happen again. And then he started pulling on my blouse and I was—I just kept saying over and over please stop, just please leave me alone and then he started grabbing me harder so I just wanted him to leave me alone so I hit him with this statue and then he . . .

\* \* \*

A lot of things are a blur, but all I can remember is that I was scared. I just wanted him to let me go and just leave me alone. I was ready to leave because he was frightening me and once I hit him he just grabbed me even harder and he wouldn't let me go and I kept saying please just let me go.

\* \* \*

And then, you know, once I hit him and he just knocked the statue out of my hand and then he started grabbing me even harder and I was like, Frank, please just let me go, just let me go, and then he wouldn't let me go and the whole time it was like he was smiling. Instead he tried to kiss on me, so he backed me up into the kitchen against the sink and he was kissing on my neck and slobbering on me. And I kept saying, Frank, please just let me go, please, just let me go, and then he wouldn't. Then he started pulling my clothes like he was trying to take them off and . . .

\* \* \*

My blouse, my pants, trying to put his hands in my pants and I kept telling him please stop it and so I started crying and I got scared and I thought once, you know, he saw that I was scared and crying he would stop. He had never acted like this before. I swear he had never tried to do anything out of the way to me. He was really frightening me. He kept grabbing me and pulling me. Then he had me up against the sink and he was trying to put his hands in my pants and I couldn't get away from him. I was trying but he was so big. He was —It was like he just had me in a locked position. And I kept saying please and then he started pulling my pants and all I could think of was—all I could think of is he's about to rape me and this is gonna happen all over again. I wouldn't be able to sleep. So I picked up the knife and I just started stabbing him.

\* \* \*

And I started crying and it seemed like everything was blurry. I just didn't even know him. I didn't even know myself. All I could think about was when I was being raped and beaten a few years before that and then I started stabbing him and he still wouldn't let me go and he took the knife from me.

\* \* \*

I think we was down. He was on top of me. You know, it was like he was trying to hunch on me, like hump on me, and I just kept saying—I just remember I was saying please stop, don't do this to me, you don't have to do this to me, Frank, please stop. Then he grabbed, he took the knife from me and for a minute I thought, you know, after I stabbed him he was going to try to stab me because I had stabbed him and so I tried to grab the knife back and that's when my finger got cut.

\* \* \*

Yes, it was. No. Like when I move this hand and I do like this, you see how my finger can curve, this finger won't even curve. I think I might have cut a nerve or something.

Dissenting Opinion by Levin, J.

\* \* \*

Yes, it was really deep, it was wide open. And I said look what you did to me and he saw it and he was still smirking and by that time he had dropped the knife and he was still trying to pull my pants down and I picked the knife up and I started stabbing him again and then he was still pulling on me and then I don't know how many times I stabbed him, but finally he just—he was still and I could just feel blood all over me and I was trying to push him off of me but he was so heavy and I could barely get him off of me. And once I pushed him off of me I was there on my knees. I started—I was still crying and I was shaking him telling him to get up and I kept saying I'm sorry, I didn't mean to but you wouldn't let me go and then he wouldn't move so I stood up and I didn't know what to do and I was just scared and I just ran off.

MALLETT, J., took no part in the decision of this case.