HARVILLE v STATE PLUMBING AND HEATING, INC

Docket No. 175256. Submitted March 19, 1996, at Detroit. Decided August 16, 1996, at 9:10 A.M. Leave to appeal sought.

Darren L. and Rena Harville brought an action in the Wayne Circuit Court against State Plumbing and Heating, Inc., alleging that the defendant, Mr. Harville's employer, had discriminated against him on the basis of race in imposing disciplinary punishment and eventually terminating his employment. The court, Susan Bielke Neilson, J., entered a judgment on a jury verdict in favor of the defendant. The plaintiffs appealed.

The Court of Appeals held:

1. In claiming discriminatory effect, but not discriminatory intent, with respect to an alleged jury selection process in the trial court that systematically and substantially results in jury panels on which blacks number proportionally less than they do in the general population of Wayne County, the plaintiffs have failed to show a violation of equal protection, Const 1963, art 1, § 2. The state Equal Protection Clause and the federal Equal Protection Clause, US Const, Am XIV, § 1, are coextensive even though the state provision, in addition to language it shares with the federal provision to the effect that no person shall be denied the equal protection of the laws, also provides that no person shall be denied the enjoyment of civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin. Because proof of discriminatory intent or purpose behind state action is required to show a violation of the federal Equal Protection Clause, similar proof is required to show a violation of the state Equal Protection Clause.

2. The trial court did not abuse its discretion in ruling that counsel for the defendant did not improperly use peremptory challenges to remove all the black jurors from the panel. A race-neutral rationale for excusing the black jurors was articulated, and the plaintiffs failed to carry the burden of proving purposeful discrimination.

3. The trial court did not abuse its discretion in refusing to disqualify for cause a juror that the defense claimed was biased. A review of the record does not indicate that the juror was biased or

that the defendant demonstrated a desire to excuse another, subsequently summoned juror who was objectionable.

4. The trial court did not abuse its discretion in allowing evidence relating to the resolution of a grievance by Mr. Harville against the defendant after it had granted the plaintiffs' motion in limine to preclude evidence relating to the grievance. The plaintiffs cannot now complain because it was their counsel who introduced evidence indicative of a grievance when cross-examining a witness and the plaintiffs' counsel agreed with the trial court that the jury needed to be told of the outcome of the grievance.

Affirmed.

1. CONSTITUTIONAL LAW — EQUAL PROTECTION — DISCRIMINATORY INTENT.

The Equal Protection Clauses of the federal constitution and the state constitution are coextensive; proof of discriminatory intent or purpose behind state action is required to show a violation of either provision; proof of discriminatory effect, alone, is insufficient to establish a violation of either provision (US Const, Am XIV, § 1; Const 1963, art 1, § 2).

2. CONSTITUTIONAL LAW — EQUAL PROTECTION — DISCRIMINATORY PURPOSE.

Discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one group than another.

3. CONSTITUTIONAL LAW — EQUAL PROTECTION — DISCRIMINATORY PURPOSE.

Discriminatory purpose implies more than intent as volition or intent as awareness of consequences; it implies that a decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.

4. JURY — PEREMPTORY CHALLENGES — RACE-BASED EXCLUSIONS — APPEAL.

Evaluation by a trial court of a claim by a civil litigant that the opposing party improperly used its peremptory challenges to remove prospective jurors on the basis of race involves a three-step process: the complaining litigant must make a prima facie showing of discrimination; the party exercising the peremptory challenges must articulate a race-neutral rationale for striking the jurors; and the court must determine whether the complaining litigant carried the burden of proving purposeful discrimination; an appellate court reviews a trial court's ruling with regard to this issue for abuse of discretion, giving great deference to the trial court's findings.

5. JURY — CHALLENGES FOR CAUSE — APPEAL.

    A trial court commits error requiring reversal in failing to exclude a juror challenged for cause where the record reveals that the court improperly denied a challenge for cause, the aggrieved party had exhausted all peremptory challenges, the party demonstrated a desire to excuse another, subsequently summoned juror, and the juror whom the party wished later to excuse was objectionable.

*Kelman, Loria, Downing, Schneider & Simpson* (by *Janet M. Tooley*), for the plaintiffs.

*Thomas E. Marshall* and *Andrew J. Bean*, for the defendant.

Before: BANDSTRA, P.J., and MARKMAN and M. D. SCHWARTZ,* JJ.

MARKMAN, J. Plaintiffs appeal as of right an order of judgment for defendant in this race discrimination action. We affirm.

In their complaint, plaintiffs alleged that defendant discriminated against plaintiff Darren L. Harville, a black employee of defendant, on the basis of race by punishing him for conduct for which white employees were not punished, and by terminating his employment. After a four-day trial, the jury found that defendant did not discriminate against plaintiff on the basis of his race in discharging him or laying him off. The trial court entered judgment in accordance with this verdict.

Plaintiffs' claims on appeal relate to the composition of the jury. Their first claim is that the jury was the product of a jury selection process that systematically and substantially underrepresented the black population of Wayne County. Specifically, they claim

---

\* Circuit judge, sitting on the Court of Appeals by assignment.

that the process resulted in juries that under-represented black Wayne County residents because (1) Detroit residents who serve on city-wide juries are excused from serving on another jury panel for one year, (2) persons who were sent a 1993 jury question-naire were not sent a 1994 questionnaire, and a lower percentage of Detroit residents than non-Detroit residents return jury questionnaires, and (3) a lower percentage of Detroit residents than non-Detroit residents appear for jury duty.[1] They claim that the allegedly disparate effect of the jury selection process on black Wayne County residents violated Const 1963, art 1, § 2, Michigan's equal protection provision. Because plaintiffs do not contend that the process was intentionally discriminatory, this appeal squarely raises the issue whether discriminatory effect alone violates art 1, § 2.

Plaintiffs raised this issue during the impaneling of the jury and again in posttrial motions. The trial court had a jury administrator, Gary Wolfe, testify regarding the jury selection process on both occasions. The court, although not deciding whether disparate effect alone could constitute a violation of art 1, § 2, con-cluded that the jury at issue was selected pursuant to a "random selection process" that was not "constitu-tionally violative."

We begin our analysis by considering cases inter-preting the federal Equal Protection Clause, US Const, Am XIV, § 1. As discussed more fully below, the Michigan Supreme Court has held that art 1, § 2 is

---

[1] Plaintiffs contend that ninety-two percent of the black population of Wayne County resides in Detroit. Accordingly, they argue that under-representation of Detroit residents in Wayne County juries results in the underrepresentation of black jurors.

coextensive with the federal Equal Protection Clause and, thus, understanding the latter is instructive in understanding the former. United States Supreme Court precedents consistently indicate that the United States Constitution's Equal Protection Clause reaches only intentional or purposeful discrimination. *Washington v Davis*, 426 US 229; 96 S Ct 2040; 48 L Ed 2d 597 (1976), involved the alleged racially discriminatory effect of a written personnel test used by a police department. The Court of Appeals had focused on the disparate effect of the test rather than a possible discriminatory purpose. *Id.* at 238. The *Washington* Court held at 239:

> The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact. [Citation omitted; emphasis in original.]

It further discussed adherence to "the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Id.* at 240. The *Washington* Court continued at 242:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. . . . Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid

under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule . . . that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations. [Citation omitted.]

In *Village of Arlington Heights v Metropolitan Housing Development Corp*, 429 US 252, 265; 97 S Ct 555; 50 L Ed 2d 450 (1977), which involved a race discrimination claim arising out of the denial of a rezoning application, the Court held that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Later, in *City of Mobile, Alabama v Bolden*, 446 US 55; 100 S Ct 1490; 64 L Ed 2d 47 (1980), involving a challenge to the city's at-large electoral system for city commissioners as racially discriminatory, a majority of the Court confirmed the necessity of demonstrating discriminatory intent to establish an equal protection violation. The four-justice plurality opinion stated:

A plaintiff must prove that the disputed plan was "conceived or operated as [a] purposeful devic[e] to further racial . . . discrimination."

This burden of proof is simply one aspect of the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment. [Citations omitted.]

\*   \*   \*

The ultimate question remains whether a discriminatory intent has been proved in a given case. [*Id.* at 66, 74.]

In an opinion dissenting on other grounds, Justice White stated at 94-95 that the Court recognized in

*Washington, supra* (in which he wrote the opinion of the Court), that "the Equal Protection Clause forbids only purposeful discrimination."[2] Recently, in *Purkett v Elem*, 514 US ___; 115 S Ct 1769; 131 L Ed 2d 834 (1995), involving the allegedly racially discriminatory use of a peremptory challenge, the Court reiterated that the relevant inquiry under the Equal Protection Clause was whether there had been "discriminatory intent" or "purposeful" discrimination. 131 L Ed 2d 839.

The Court has defined "discriminatory purpose" and articulated the role of disparate effect evidence in equal protection cases. In *Personnel Administrator of Massachusetts v Feeney*, 442 US 256; 99 S Ct 2282; 60 L Ed 2d 870 (1979), the Court considered a claim that a veterans preference in state employment resulted in sex discrimination. It stated that *Washington* and *Arlington Heights* "signaled no departure from the settled rule that the Fourteenth Amendment guarantees equal laws, not equal results." 442 US 273. It held at 279:

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

---

[2] Justice White's disagreement with the majority was that he believed that the intent standard had been satisfied in the *Mobile* case. "Because I believe that the findings of the District Court amply support an inference of purposeful discrimination in violation of the Fourteenth and Fifteenth Amendments, I respectfully dissent." *Id.* at 103. *Mobile* also held that the Fifteenth Amendment, prohibiting voting discrimination, required evidence of discriminatory intent. "None [of our earlier decisions] has questioned the necessity of showing purposeful discrimination in order to show a Fifteenth Amendment violation." *Id.* at 63.

*Hernandez v New York*, 500 US 352; 111 S Ct 1859; 114 L Ed 2d 395 (1991), involved a claim that a prosecutor used peremptory challenges to exclude Latino jurors because of uncertainty whether they would accept an interpreter's translation of Spanish-speaking witnesses. A majority of the Court reiterated that disparate effect, alone, is insufficient to establish an equal protection violation. The four-justice plurality opinion stated at 362:

> [D]isparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary race-neutrality step of the *Batson* [*v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986)] inquiry. An argument relating to the impact of a classification does not alone show its purpose. Equal protection analysis turns on the intended consequences of government classification. Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race neutrality. [Citation omitted.]

Justices O'Connor and Scalia concurred in a separate opinion, in which they stated at 372-373:

> An unwavering line of cases from this Court holds that a violation of the Equal Protection Clause requires state action motivated by discriminatory intent; the disproportionate effects of state action are not sufficient to establish such a violation.

This clear precedent indicates that plaintiffs' present claim, alleging only disparate effect, not discriminatory intent, would fail to state a violation had it been raised under the federal Equal Protection Clause. Plaintiffs nonetheless assert that their disparate effect claim states a violation of the Michigan Constitution's equal protection provision, Const 1963,

art 1, § 2. Michigan's equal protection provision
includes language not contained in the federal Equal
Protection Clause. The federal provision states, "nor
[shall any state] deny to any person within its juris-
diction the equal protection of the laws." In contrast,
Const 1963, art 1, § 2 states:

> No person shall be denied the equal protection of the
> laws; nor shall any person be denied the enjoyment of his
> civil or political rights or be discriminated against in the
> exercise thereof because of religion, race, color or national
> origin.

Despite the differences in their language, the Michi-
gan Supreme Court has found Michigan's equal pro-
tection provision coextensive with the federal consti-
tution's Equal Protection Clause. Most recently, in
*Frame v Nehls*, 452 Mich 171; 550 NW2d 739 (1996), a
grandparent visitation action, the Court stated that
"[t]he Michigan and federal Equal Protection Clauses
offer similar protection." *Id.* at 183. In *Doe v Dep't of
Social Services*, 439 Mich 650; 487 NW2d 166 (1992),
the Court considered art 1, § 2 in the context of a
challenge to legislation that prohibited the use of pub-
lic funds for abortions. The Court found that "a
review of the jurisprudence and constitutional history
of this state suggests . . . that our equal protection
clause was intended to duplicate the federal clause
and to offer similar protection." *Doe* at 670-671. It
stated that the language of our Equal Protection
Clause is "essentially the same" as that in the Four-
teenth Amendment. *Id.* at 671-672. It noted that the
Michigan Constitution has a second clause unlike the
federal constitution, but stated at 672:

> [T]hat a separate clause to provide explicit protection for civil rights was adopted in the midst of the civil rights movement, does not, in and of itself, suggest any purpose on the part of the delegates to broaden the scope of the preceding Equal Protection Clause.

The Court further stated at 673-674:

> Rather, we draw from a reading of the convention record the firm conclusion that the delegates intended to affirm and incorporate the basic notions of equal protection that prevailed at the time.

Under these cases, plaintiffs are held to the same burden under art 1, § 2 as under the Fourteenth Amendment; i.e., they must demonstrate intentional or purposeful discrimination. Because plaintiffs do not allege any intentional discrimination in the jury selection procedure, their equal protection claim must fail.

Further, the Michigan Supreme Court specifically addressed the issue of disparate effect evidence in equal protection cases in *People v Ford*, 417 Mich 66; 331 NW2d 878 (1982). In *Ford*, the defendant challenged his being charged with the felony of larceny in a building when the evidence also supported a misdemeanor general larceny charge. The defendant provided the court with statistical information comparing the racial breakdown of arrests for larceny-theft (twice as many whites as blacks) and the racial breakdown of Michigan's prison composition (over fifty percent black). *Id.* at 102. The *Ford* Court stated that the defendant asked it "to take a quantum leap in equal protection analysis based on unproven assumptions and non-sequitur statistical inferences." *Id.* at 103. It held at 103:

> In the absence of a purpose to cause racial discrimination, governmental action that has a disproportionate effect on a racial minority is not unconstitutional. Such an effect may permit an inference of an unlawful purpose, but, standing alone, it is not *conclusive* on the question whether governmental activity is racially discriminatory. [Emphasis in original.]

The Court concluded that the prosecutor's exercise of discretion in the cases before it did not per se violate the Equal Protection Clause under either the federal or the Michigan Constitution. *Id.* at 105. *Ford,* accordingly, also indicates that plaintiffs' equal protection claim fails.

Contrary to these precedents, a panel of this Court found that the disparate effect of an ordinance restricting use of city parks to city residents, without reference to discriminatory intent, was sufficient to constitute a violation of art 1, § 2 in *Detroit Branch, NAACP v Dearborn,* 173 Mich App 602; 434 NW2d 444 (1988).[3] The *NAACP* Court almost exclusively relied on *Berry v Benton Harbor School Dist,* 467 F Supp 721 (WD Mich, 1978), for its conclusion that art 1, § 2 was intended to provide greater protection than that afforded by the Fourteenth Amendment and that discriminatory intent or purpose need not be proved in cases under art 1, § 2.[4] *NAACP* at 615. *Berry* was a

---

[3] In *Doe, supra,* the Michigan Supreme Court decision equating the Michigan and the federal Equal Protection Clauses, the Court cited *NAACP* after the designation "cf." *Doe* at 674, n 30. Clearly, *Doe* impliedly overruled *NAACP's* holding that art 1, § 2 is interpreted differently than the federal Equal Protection Clause.

[4] The *NAACP* Court offered no other argument in support of its conclusion that art 1, § 2 prohibits disparate effect without reference to intent or purpose. It merely distinguished *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation,* 425 Mich 173, 186; 387 NW2d 821 (1986), which was cited in support of the proposition that art 1, § 2

school desegregation action. The *Berry* Court held at 730:

> It is plainly evident that Article I, section 2, and Article VIII, section 2 [requiring provision for education without discrimination with regard to religion, creed, race, color or national origin] of the Michigan Constitution go beyond the limits of the Fourteenth Amendment by prohibiting all racial segregation, without regard to whether it was caused by a segregative purpose.

The *Berry* Court stated that its holding was based on the plain wording of the provisions at issue, which prohibited "discrimination"—a word not found in the Fourteenth Amendment. *Id.* It noted that art 1, § 2 tracks the Fourteenth Amendment in part but adds an antidiscrimination clause. *Id.* It concluded at 730-731:

> This clearly indicates that discrimination and equal protection of the laws are two different concepts under the Michigan Constitution, and thus when a court relies on the anti-discrimination clause it should not be guided by the traditional equal protection analysis. Instead, this court chooses to rely on the plain wording of Article I, section 2, and Article VIII, section 2, and in neither one does it state that an intent or purpose to discriminate must be proven before liability can be imposed, for that would defeat the clear, plain intent of the drafters proclaimed on August 1, 1963.

The court stated that reading an intent requirement into these provisions would violate basic principles of

---

provides no broader protection than does the federal Equal Protection Clause. Quite apart from *Waterford Twp, Ford* clearly establishes this same proposition, which proposition was expressly affirmed in *Doe.*

We also note that significant evidence existed in *Dearborn* to suggest that the actions taken by the defendant were, in fact, taken for the *purpose* of discriminating against racial minorities. *Id.* at 609-612.

constitutional interpretation requiring that words used be given their plain meaning as understood by those who adopted the constitution. *Id.* at 732. It stated at 732:

> The plain meaning of the word "discrimination" is "a showing of partiality or prejudice in treatment, . . . action or policies directed against the welfare of minority groups." Second College Edition, Webster's New World Dictionary of the American Language.

With respect to Michigan law, we are, of course, bound to follow the decisions of the Michigan Supreme Court. See *Boyd v W G Wade Shows*, 443 Mich 515, 523; 505 NW2d 544 (1993); *People v Bullock*, 440 Mich 15, 27; 485 NW2d 866 (1992). Thus, we are bound to follow *Doe* and *Ford* rather than *NAACP* or *Berry*. However, in the interest of completeness, we will address the specific issue discussed in *Berry*: whether, because of textual differences in the Michigan and the federal Equal Protection Clauses, disparate effect alone is sufficient to state a violation of art 1, § 2.

We initially note that "discrimination" in the sense of distinguishing between people is a common and necessary occurrence. For example, an employer must distinguish between applicants to decide whom to hire and a college admissions officer must distinguish between applicants to decide whom to admit. Article 1, § 2 clearly does not prohibit making distinctions between people; distinctions between individuals are routinely made in every walk of life by other individuals.

In giving meaning to the additional provision in art 1, § 2, we begin with the plain meaning of the words

therein. The operative language of this clause in the context of the present case is "discriminated against." Similarly, the *Berry* Court quoted a dictionary definition of discrimination as "treatment, . . . action or policies *directed against* the welfare of minority groups." *Berry* at 732. (Emphasis added.) We fail to understand how a group could be "discriminated against" or how a treatment, action, or policy could be "directed against" a group without some intent to do so on the part of the entity engaged in the discrimination. The use of these phrases strongly suggests a state of mind or *mens rea* on the part of the alleged discriminator. Indeed, a clear element of intent inheres in the very definition of discrimination itself.[5] This element was aptly described in the *Feeney* Court's statement that the Equal Protection Clause requires that prohibited actions be taken "at least in part 'because of,' not merely 'in spite of' their adverse effects upon an identifiable group." *Feeney* at 279. Accordingly, discrimination under art 1, § 2 does not turn upon the statistical *outcome* of an action, but rather upon the *process* by which it was reached.

Further, the mere absence of the word "intent" from the second clause of art 1, § 2 does not, as the *Berry* Court indicated, demonstrate that intent is not required. The word "intent" does not appear either in the Fourteenth Amendment or in the first clause of art 1, § 2. Yet the *Berry* Court itself did not dispute that intent is required under these clauses. While "intent" does not appear in the second clause of art 1, § 2, neither do words that suggest that actions are

---

[5] To discriminate is to "distinguish, differentiate . . .distinguish with the mind." *New Shorter Oxford English Dictionary* (1993) at 689. To distinguish is "to recognize or treat as different." *Id.* at 707.

prohibited merely on the basis that they yield a statistically disparate effect. What language *does* appear is that which provides that no one shall be *"discriminated* against . . . *because of* religion, race, color or national origin." We do not believe that this language is at all inconsistent with the standards of the federal Equal Protection Clause and the first clause of art 1, § 2 that only actions involving an intent or purpose to discriminate are thereby barred.

Our review of the record of the 1963 constitutional convention leads us to agree with the *Doe* Court that no drafting history or contemporary electoral understanding exists to suggest anything other than an intention to affirm and continue the equal protection standards applied at that time. Debate during the convention focused on the issue of equal protection with respect to private establishments, especially public accommodations, and the scope of state action, 1 Official Record, Constitutional Convention 1961, pp 741, 743, 746-749, as well as whether "sex" should be listed along with religion, race, color, or national origin as a basis of discrimination. 2 Official Record, Constitutional Convention 1961, pp 2888-2891, 2911-2916, 3088-3092. A member of the committee that drafted the proposal for the second clause of art 1, § 2 indicated that the committee thought that "the mere equal protection clause, would, in itself, cover it" but decided to specify that "persons should not be discriminated against because of sex, religion, race or national origin." 1 Official Record, Constitutional Convention 1961, p 743.[6]

---

[6] Debate at the convention regarding other constitutional civil rights provisions provides support for the proposition that protections beyond those afforded by the federal constitution were considered unnecessary.

The portions of the official record addressing art 1, § 2 include no discussion whatsoever of disparate effect or any suggestion that the standard for identifying civil rights violations be different under the second clause than the first. The absence of any discussion of this issue, which would have involved a far-reaching transformation in the meaning of equal protection, implies strongly that the drafters intended to maintain an equal protection jurisprudence that requires the element of intent.[7] If the drafters intended to make such a departure from existing notions of equal protection, there would surely have been some mention of such a change during the convention.

Further, during this period in American history, considerable debate surrounded the adoption of a federal civil rights act, which culminated the next year in the passage of the landmark Civil Rights Act of 1964. The focus of this debate was not intent versus effect as a basis for defining "discrimination," but

---

In *Berry*, the court notes that, in connection with art VIII, the drafters expressed a similar sentiment that an antidiscrimination clause might be unnecessary because of rights established in the federal constitution. *Berry* at 732, n 7.

[7] Existing equal protection jurisprudence includes both cases predating the 1963 Michigan Constitution, e.g., *Akins v Texas*, 325 US 398, 403-404; 65 S Ct 1276; 89 L Ed 1692 (1945) (requiring purposeful discrimination in jury selection process under the Fourteenth Amendment); *Snowden v Hughes*, 321 US 1, 8; 64 S Ct 397; 88 L Ed 497 (1944) (no denial of equal protection absent "an element of intentional or purposeful discrimination"); *Yick Wo v Hopkins*, 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886) (equating "discrimination" with an "oppressive . . . mind," an "evil eye," an "unequal hand," and "hostility to the race") and cases issued after 1963 that articulate principles of equal protection admittedly consistent with pre-1963 precedent, e.g., *Hernandez* at 372-373 ("unwavering line of cases" holds that intent is required); *Washington* at 239 ("our cases have not embraced the proposition that a law . . . without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact.").

rather the application of nondiscrimination rules to areas such as public accommodations, employment, and housing. Specifically, much debate centered upon whether the "state action" requirement of the Fourteenth Amendment was satisfied in the case of private establishments, such as hotels and restaurants, and, alternatively, whether such establishments could properly be considered to be within the stream of interstate commerce. US Const, art I, § 8, cl 3. See, generally, Whalen & Whalen, *The Longest Debate* (Seven Locks, 1985); *Heart of Atlanta Motel v United States*, 379 US 241; 85 S Ct 348; 13 L Ed 2d 258 (1964); *Katzenbach v McClung*, 379 US 294; 85 S Ct 377; 13 L Ed 2d 290 (1964); *Griffin v Maryland*, 378 US 130; 84 S Ct 1770; 12 L Ed 2d 754 (1964); *Peterson v Greenville*, 373 US 244; 83 S Ct 1119; 10 L Ed 2d 323 (1963); *Lombard v Louisiana*, 373 US 267; 83 S Ct 1122; 10 L Ed 2d 338 (1963).

The drafters of Michigan's Constitution were obviously aware of these ongoing debates and apparently attempted to avoid similar arguments by setting out an explicit antidiscrimination clause in art 1, § 2. In introducing the proposal that ultimately became art 1, § 2, the chairman of the Proposal Committee stated: "The principal, but not exclusive, areas of concern are equal opportunities in employment, education, housing, and public accommodations." 1 Official Record, Constitutional Convention 1961, p 740. The convention record does not provide support for the argument that the drafters intended art 1, § 2 to prohibit actions having a disparate effect on a group without reference to discriminatory intent.

For these reasons, we are convinced that art 1, § 2, like the Fourteenth Amendment, prohibits only inten-

tional or purposeful discrimination. Disparate effect may constitute evidence that demonstrates an intent to discriminate. *Washington*, supra at 242. However, disparate effect, alone, is insufficient to demonstrate a violation of art 1, § 2. Accordingly, plaintiffs' equal protection claim here fails.[8]

Plaintiffs next claim that defendant improperly used its peremptory challenges to remove all the black jurors from the panel. *Edmonson v Leesville Concrete Co*, 500 US 614; 111 S Ct 2077; 114 L Ed 2d 660 (1991). *Batson v Kentucky, supra*, sets forth a three-step process for evaluating such claims: (1) the complaining litigant must make a prima facie showing of discrimination, (2) the burden then shifts to the party exercising the peremptory challenge to articulate a race-neutral rationale for striking the juror at issue, and then (3) the court must determine whether the complaining litigant carried the burden of proving "purposeful discrimination." See *People v Barker*, 179 Mich App 702, 705-706; 446 NW2d 549 (1989), aff'd 437 Mich 161; 468 NW2d 492 (1991).[9] An appellate court is to give great deference to the trial court's findings on this issue because they turn in large part

---

[8] We emphasize that we are not deciding here that plaintiffs have established that the jury selection system in Wayne County would violate the Michigan Constitution if art 1, § 2 were satisfied by a mere showing of disparate effect. We only decide that this is not the proper standard for determining a constitutional civil rights violation. Plaintiff has not alleged anything beyond disparate effect.

We also note that plaintiffs' challenge under art 1, § 2 is distinct from the issue raised in *People v Hubbard*, 217 Mich App 459; 552 NW2d 493 (1996) — whether the jury selection process in that case violated the "fair-cross-section requirement" of the Sixth Amendment of the United States Constitution. *Id.* at 464.

[9] We see no reason why these standards, developed in the criminal trial context, are not equally applicable in the civil trial context. *Haberkorn v Chrysler Corp*, 210 Mich App 354, 369; 533 NW2d 373 (1995).

on credibility. *Id.* at 706; *Hernandez, supra* at 365. We review trial court rulings regarding *Batson* challenges for an abuse of discretion. *People v Hart (After Remand)*, 170 Mich App 111, 112; 427 NW2d 557 (1988).

Here, the trial court *sua sponte* called counsel into chambers when it noted that defendant had used its peremptory challenges to strike the three black jurors on the panel. Defense counsel stated that he struck two of the black jurors because they stated that, in unrelated circumstances, they had been discriminated against and that their claims had not been satisfactorily resolved. He stated that he struck a third black juror because he was an attorney. Plaintiffs' counsel pointed out that a white juror also stated that he had been discriminated against and defendant did not challenge him. However, this juror indicated that the situation had been completely resolved. On appeal, plaintiffs also argue that another white juror discussed involvement in a situation involving alleged discrimination. But this juror did not claim that he had himself been discriminated against. The trial court concluded that the reasons articulated by defendant's counsel were legitimate reasons for excusing jurors. On the basis of our review of the voir dire, we are satisfied that the court did not abuse its discretion in finding that defendant articulated a race-neutral rationale for excusing the black jurors and that plaintiffs failed to meet their burden of demonstrating purposeful discrimination in defendant's use of peremptory challenges.

Plaintiffs next claim that the trial court erroneously failed to disqualify a juror for cause. In *Poet v Traverse City Osteopathic Hosp*, 433 Mich 228, 231; 445

NW2d 115 (1989), the Court set out the following criteria for such claims:

> We hold that a trial court commits error requiring reversal when the record reveals that: (1) the court improperly denied a challenge for cause, (2) the aggrieved party had exhausted all peremptory challenges, (3) the party demonstrated a desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable.

It held at 236-237:

> Ultimately, however, the decision to grant or deny a challenge for cause is within the sound discretion of the trial court. Nevertheless, in exercising this discretion, the trial judge is not without constraint.
>
> *    *    *
>
> In addressing the present circumstance, where a venire person has expressed a strong opinion, yet has resolved that she can be impartial, we believe the trial court's discretionary function should be balanced against its obligation to fulfill each litigant's right to a fair trial. [Citations omitted.]

Here, we question whether plaintiffs meet the third and fourth criteria set forth in *Poet*. Their counsel used a peremptory challenge to strike the juror at issue and expressed dissatisfaction with the jury ultimately seated, but never identified a specific additional juror that she would have used a peremptory challenge to excuse. On this basis, plaintiffs' claim on appeal appears to fail.

We will nonetheless briefly address the merits of plaintiffs' claim that the trial court improperly denied the challenge of juror Gise. Juror Gise stated that she had been a loss-prevention security officer for a store for 7½ years. She estimated that over seventy percent

of the people she has accosted in that capacity were black. However, she set forth only race-neutral characteristics that caused her to stop a person and stated that she gets angry when she is accused of stopping people on the basis of their race. She acknowledged that approximately eight percent of the people she stops do not have any stolen merchandise in their possession and stated that this occurs because she misses something or they put the merchandise down and "not because of picking them out because of bad color." She averred that she could be unbiased and objective in deciding the plaintiffs' case. Plaintiffs' counsel argued that Gise's experiences of being accused of stopping people on the basis of their race made it impossible for her to be unbiased in this case. The trial court stated:

> I am unaware of anything that allows me to say that she is lying and that she is discriminatory in her stops, especially with the rest of her statements, and, in fact, I didn't believe she was lying. So I'm not going to excuse her.

The voir dire relating to Gise does not demonstrate that she was biased, whether against plaintiffs or anyone else. We therefore find no abuse of discretion in the trial court's decision not to strike this juror for cause.

Plaintiffs' final claim is that the trial court erroneously admitted evidence that plaintiff Darren Harville had unsuccessfully filed a grievance with his union relating to his termination. This Court reviews trial court decisions to admit evidence for an abuse of discretion. *Price v Long Realty, Inc*, 199 Mich App 461, 466; 502 NW2d 337 (1993).

Here, the trial court had granted plaintiffs' motion in limine to preclude evidence relating to the grievance. However, in cross-examining the person who terminated plaintiff, plaintiffs' counsel asked him if he changed the termination from a layoff to a discharge for cause "because [plaintiff] filed a grievance." In response to this questioning, the trial court stated that it was necessary to inform the jury of the outcome of the grievance "in a neutral fashion so that the jury disregards what has been inappropriately interjected into this lawsuit." The court ruled that the jury should be informed that the grievance was resolved in the employer's favor.[10] Plaintiffs' counsel stated: "I have no problem with that. I think that's probably obvious anyway." In the interest of completeness, the trial court appropriately decided to allow the jury to briefly hear the outcome of the grievance once it learned that a grievance had been filed.

In order to assess plaintiff's claim that defendant retaliated against him for filing a grievance, it was proper for the jury to know that the grievance was resolved in defendant's favor. We accordingly find no abuse of discretion. Further, after successfully moving to preclude evidence relating to the grievance, plaintiffs' counsel herself solicited testimony from defendant about the grievance. Plaintiffs' counsel also specifically agreed with the trial court's ruling that the jury be informed of the outcome of the grievance. "Reversible error cannot be error to which the

---

[10] Defendant's witness went beyond the court's ruling by testifying not only that the grievance was resolved in defendant's favor but that it was found that he "had a right to, to discharge him for cause." However, plaintiff made no objection to this testimony.

aggrieved party contributed by plan or negligence." *Byrne v Schneider's Iron & Metal, Inc*, 190 Mich App 176, 184; 475 NW2d 854 (1991). For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.