Cindy A. PILON, Plaintiff,

v.

SAGINAW VALLEY STATE
UNIVERSITY and Richard
P. Thompson, Defendants.

No. 03–100006–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Dec. 22, 2003.

Glen N. Lenhoff, Law Office of Glen N. Lenhoff, Flint, MI, Julie A. Gafkay, Frankenmuth, MI, for plaintiff.

Emil L. Ognisanti, Jamie H. Nisidis, Braun, Kendrick, Saginaw, MI, Timothy S. Arnold, Miller, Canfield, Detroit, MI, for defendant.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

Plaintiff, Cindy Pilon, a Caucasian female, applied for a job as the coordinator of campus recreation for defendant Saginaw Valley State University (SVSU). She did not get the position, which instead was filled by an African–American male. The plaintiff, apparently believing that she was not hired on account of her race, filed the present action alleging "reverse discrimination" under various theories of federal and state law. The defendants have moved for summary judgment, contending that the plaintiff's race was not a factor in their decision not to hire her, and that the plaintiff has not come forward with any evidence suggesting otherwise. The Court heard the parties' arguments through their counsel in open court on December 17, 2003. The Court finds that the record as

presented contains no direct evidence of discrimination against the plaintiff, and the plaintiff has not brought forth any other evidence from which it could be inferred that an illegal discriminatory motive was a significant factor in the defendants' decision not to hire the plaintiff. The Court, therefore, will grant the defendants' motion for summary judgment and dismiss the case.

## I.

Saginaw Valley State University is a mid-sized liberal arts college with an enrollment of approximately 9,300 students, located in mid-Michigan. Many of its students commute to campus, and a significant aspect of campus social life involves recreational activity, including intramural sports participation. The University sponsors recreational programs and coordinates these activities as part of campus life. The Coordinator of Campus Recreation position, the job for which the plaintiff applied in this case, falls under the supervision of the Campus Life Department at SVSU. The defendants describe the position as follows:

**JOB SUMMARY:** Plan, develop, promote, direct and supervise all facets of the Campus Recreation Program and the SVSU Athletic Summer Camp Program.

**ESSENTIAL DUTIES & RESPONSIBILITIES:** Plan and implement a program of team and individual intramural sports and indoor/outdoor recreational activities for the entire university community.

Coordinate all aspects of the SVSU Athletic Summer Camps: scheduling, marketing, accounting, registration, communication and final reconciliation.

Select, train, and assist student supervisors, assistants and referees, including all student employee time cards, monitoring hours worked and/or games officiated.

Supervise the Ryder Center Help Desk: including employees, scheduling, office space, building security, general inquiries and bookkeeping.

Organize and coordinate publicity, schedules, and flyers for the department and programming, including a handbook for participant information.

Set up and meet regularly with a campus wide advisory committee.

Assist with administration of the recreation budget.

Maintain inventories of all properties and equipment assigned to Campus Recreation.

Coordinate facilities with master schedule.

Prepare annual statistics for Campus Recreation.

**RELATED DUTIES:**

Other duties as assigned.

**SUPERVISION RECEIVED:**

Administrative supervision is received from the director of Campus Life.

**SUPERVISION EXERCISED:**

Student employees, referees, Help Desk employees and assistants.

**MINIMUM QUALIFICATIONS:**

Bachelor's degree in Sports Administration, Recreation, Physical Education, or related field with experience in university intramurals and marketing preferred.

Past management experience.

Excellent organizational and time management skills.

Computer and accounting skills necessary.

Ability to mentally and physically perform the essential duties of the position with or without accommodation.

**WORKING CONDITIONS:**

Duties are generally performed inside and not exposed to adverse conditions. Def.'s Mot. S.J. Ex. E. The Coordinator of Campus Recreation is an entry level position that pays between $22,000 and $26,000 per year. Because the person holding the position oversees campus intramural programs, that person may be required to work non-traditional hours including having to work on some occasions from 10:00 p.m. until 2:00 a.m.

The plaintiff, Cindy S. Pilon, born on September 9, 1969, is a 34-year old Caucasian female. The plaintiff graduated *cum laude* from Central Michigan University in Mt. Pleasant, Michigan in 1992 with a Bachelor of Applied Arts degree in parks and recreation management. She then attended graduate school at Central Michigan University from 1992 to 1993 where she received a Master's degree in parks and recreation administration, graduating *summa cum laude.*

In the summers of 1985 through 1989 and 1992, the plaintiff was employed by Midland County Parks in Sanford, Michigan as a general maintenance worker. Her job responsibilities included "mowing, trimming, painting, concession operations, gatekeeping, various budgeting activities, beach patrol and various public service duties." From December 1991 to July 1992, the plaintiff completed a 30-week internship at the Huron–Manistee National Forest office in Cadillac, Michigan, where she gave presentations to the public about the forest service and recreation activities in the national forest. She also used a computer to perform accounting and budgeting work. While attending graduate school, the plaintiff worked as a graduate assistant from August 1992 to May 1993. She co-advised the Student Recreation Association at Central Michigan University and generally provided assistance to undergraduate students in the parks and recreation department.

After graduation, the plaintiff took a job with Thomas Township Parks and Recreation near Saginaw, Michigan. In that position, the plaintiff supervised approximately 30 summer staff members, coordinated and oversaw all recreational activities and programming in the various Thomas Township parks, organized and conducted Parks and Recreation Commission meetings, did general maintenance work, and performed budgeting and other miscellaneous administrative tasks. Her salary was approximately $16,500 per year and she worked for the township from January 1994 to August 1994. She left that position because she was dissatisfied with the work environment.

The plaintiff then found a job with Kelly Temporary Services doing clerical work before landing her present job as a 911 dispatcher for Midland County in February 1995. As a dispatcher, the plaintiff's job responsibilities include handling calls for police, fire and medical emergencies, performing various clerical, public relations, and education duties, and performing various supervisory functions; the plaintiff is now the acting supervisor at the dispatch center. She earns approximately $15.33 per hour, or about $32,000 per year. The plaintiff has not worked in the parks and recreation field since 1994.

In 2001, the Coordinator of Campus Recreation position at SVSU became vacant after Robert Sonnenburg, a Caucasian male, left the position to pursue other opportunities. SVSU placed an advertisement in the local newspapers announcing the open position. The advertisement contained a brief description of the position similar to the description listed above and stated the requirements as: "Bachelor's degree in sports administration, recreation, physical education or related field,

past management experience and excellent organizational and time management skills. Experience in university intramurals and marketing preferred." Def.'s Mot. S.J. Ex. F.

The plaintiff applied for the position on May 27, 2001 by mailing a cover letter, résumé, and a list of references to the address listed in the job announcement. On June 1, 2001, the plaintiff received a letter from James B. Wood, Director of Human Resources at SVSU, acknowledging SVSU's receipt of her application for the position. Mr. Wood asked the plaintiff if she would "voluntarily" provide "confidential data" to the "Affirmative Action Office" and enclosed a form for the plaintiff to complete. *See* Pl.'s Br. in Opposition to Def.'s Mot. S.J. Ex. 10. The plaintiff returned the form, which indicated her race and gender.

Defendant Richard Thompson, a Caucasian male, was the Dean of Student Affairs at SVSU in 2001 and was the SVSU official in charge of hiring a person to fill the Coordinator of Campus Recreation position. Thompson established a search committee to evaluate the candidates for the position and to narrow the field. He chose Eric Buschlen, a Caucasian male, to be the chair of the committee. Buschlen is the director of the campus life and recreation department at SVSU and is the direct supervisor over the Coordinator of Campus Recreation position. The other members of the hiring committee were Joe Vogl, a Caucasian male who was the director of the Ryder Center, the health and physical education building on the SVSU campus; Theresa George, a Caucasian female who was a student leader and involved in campus life activities; Matt Johnson, a Caucasian male who was the elected student government president at SVSU; and Shawn Wilson, an African American male who was the assistant director of residential life programs at SVSU.

All applications for the position were submitted to Mr. Wood, whose office collected the applications and then forwarded them to the search committee for evaluation. The search committee received over 40 applications from various candidates. Buschlen testified at his deposition that the search committee was looking for someone "with an experience in athletics" who "had that experience either as a student or as a professional, because that's really an important part of this job." Def.'s Mot. S.J. Ex. C, dep. of Eric Buschlen at 13. Buschlen also stated that although a large percentage of the applications were from individuals with a parks and recreations background, like the plaintiff, the search committee was looking more for someone with an intramural sports background. Mr. Vogl, another member of the search committee, testified at his deposition that he was primarily interested in a candidate with an accounting background so the individual could handle the accounting issues that arose with the summer camps that SVSU holds every year. *See* Def.'s Mot. S.J. Ex. H, dep. of Joseph Vogl at 9–10. He also described the search committee's belief that individuals with parks and recreation backgrounds were not necessarily the ideal candidates for the position; he said that the committee focused more on individuals with intramural sports backgrounds. This sentiment was also echoed by Shawn Wilson.

After reviewing the applications, the search committee selected three finalist who they agreed possessed the professional experience the committee sought and scheduled these individuals for interviews. The plaintiff was not selected as one of the finalists. The committee then sent out letters to the rest of the applicant pool

notifying the applicants, including the plaintiff, that they were no longer being considered for the Coordinator of Campus Recreation position. Defendant Richard Thompson did not participate in the decision to narrow the field to three candidates and only became involved in the hiring process after the three candidates were selected. Consequently, he never saw the plaintiff's résumé and never spoke with the plaintiff.

The three finalists were Kristina Berry, a Caucasian female who had a Master's degree, was originally from Bridgeport, Michigan, and was working as the intramural coordinator at a university in New Hampshire; Dean Potter, a Caucasian male who was working for the YMCA in Bay City, Michigan; and Christopher Bartnikowski, a Caucasian male who was working for the City of Saginaw as its community recreation person. All three finalists were interviewed by the search committee and then underwent a final interview with Richard Thompson.

After conducting the interviews, the hiring committee recommended making an offer to Ms. Berry. Mr. Thompson agreed with the recommendation and extended an offer to her. Mr. Buschlen testified that Ms. Berry was the hiring committee's first choice because she "was working in the university intramural/recreation field" and "had the academic background." Def.'s Mot. S.J. Ex. C, dep. of Eric Buschlen at 18. Ms. Berry, however, turned down the offer because SVSU would not pay for her relocation expenses and the position paid $10,000 less than her current job in New Hampshire. The hiring committee and Mr. Thompson then agreed to extend an offer to Mr. Bartnikowski, who also turned down the job because he was looking more for a "9–to–5" job and did not like the hours of the position. Id. at 18. The hiring committee and Mr. Thompson de-cided not to extend an offer to the third finalist, Dean Potter, because in his interview he did not show any enthusiasm for the position and the committee believed that he would not be a good choice.

At this point in time, around July 2001, the search committee was faced with an urgent situation because the Coordinator of Campus Recreation position needed to be filled before the start of the school year, which occurred around the third week in August. Therefore, with only about three to four weeks to hire someone, Thompson and Buschlen decided to refocus and redirect their search. Due to the new time constraints, only Thompson, Buschlen, and Vogl were involved in the second round of the search. See Def.'s Mot. S.J. Ex. H, dep. of Joseph Vogl at 14. The new search committee believed that they had lost qualified candidates because of the low pay and non-traditional hours of the position. See Def.'s Mot. S.J. Ex. C, dep. of Eric Buschlen at 22. Therefore, they decided to focus on SVSU students and recent SVSU graduates that had been involved in the campus recreation system at SVSU and who might be more agreeable to the relatively low pay and non-traditional hours of the position. They decided not to go back to the original applicant pool, which included the plaintiff, in part because the rejection letters had already been sent out. The search committee identified two individuals who they felt might be interested in the position: Jerome Foster, an African American male, and Brian Waliczek, a Caucasian male. Both individuals were recent SVSU graduates. Foster had received a Bachelor's degree in business administration from SVSU, was enrolled in a graduate program at the school, was actively involved in the intramural programs on campus, was the president of his fraternity, and was a student leader. Waliczek was also involved in student government and was a student

athlete at SVSU. Buschlen testified at his deposition that prior to contacting Foster, he was not sure that Foster would be qualified for the job, but that after talking to Foster and learning of his qualifications, he felt that Foster should be interviewed. *Id.* at 24–25.

The hiring committee interviewed Foster and Waliczek and offered the Coordinator of Campus Recreation position to Foster, primarily because Waliczek had begun a career as a professional bowler and his schedule would not permit him to be a professional bowler and a campus recreation coordinator at the same time. Thompson also believed that Waliczek was not as enthusiastic about the position in the interview as Foster. Moreover, Vogl found Foster's accounting background and experience working for the SVSU controller's office to be beneficial.

Meanwhile, after receiving the letter from SVSU notifying her that she was no longer being considered for the Coordinator of Campus Recreation position, the plaintiff called Mr. Wood in the SVSU human resources office to inquire more about the decision not to interview her. The human resources office transferred the plaintiff's call to Eric Buschlen. The plaintiff spoke with Mr. Buschlen and asked him why she was not being considered for the position. According to the plaintiff's deposition testimony, he responded by telling her that he had received applications from five other individuals with Master's degrees and that he considered them over the plaintiff because, unlike the plaintiff, these individuals were currently working in the recreation field. *See* Def.'s Mot. S.J. Ex. B, dep. of Cindy Pilon at 47–48. The plaintiff found this explanation unplausible and decided to investigate the matter further. The plaintiff requested documents from SVSU pertaining to the hiring decision of the Coordinator of Campus Recreation position under the Freedom of Information Act. It appears as though the plaintiff, after reviewing the documents she received from SVSU, determined that she was not hired for the position because she is Caucasian and that SVSU was determined to hire a person of a minority race. She based this determination, in part, on the fact that SVSU has an "Affirmative Action" plan. The plaintiff also believes that she was more qualified for the position than Mr. Foster, who does not hold a Master's degree.

SVSU had adopted an affirmative action plan in 1996. The plan contains a resolution on cultural diversity that describes the university's commitment to "reduce the barriers that inhibit success by minorities." Def.'s Mot. S.J. Ex. L at ii. The resolution also states that the university must "undertake extraordinary efforts in the years ahead to serve students from diverse, racial and ethnic communities" and that "[t]his will require efforts to expand the pool of available candidates in hiring decisions, to provide genuine consideration for a greater variety of relevant experiences and credentials to achieve the University's broad goals." *Id.* at iii. In another section of the plan, entitled "Reaffirmation of Policy," the school states that it "will continue to seek an employee distribution by race and sex, in each job classification, which reflects the availability of each group in the relevant labor market." *Id.* at 1. The plan also contains the directive of SVSU's president, Eric R. Gilbertson, who stated that "the opportunity to promote diversity among faculty and staff will be an important consideration in any future decisions as to the allocation of new or replacement positions." *Id.* at 2.

The plan contains an appendix with statistical information relating to the number of minority employees at SVSU. The ap-

pendix separates the employees at SVSU into groups based on the type of work they perform. One of the groups is denominated as "Athletic Professionals," and includes the athletic trainers, assistant and head coaches, and the director of athletics. The Coordinator of Campus Recreation position is also included in this group. There are a total of 20 employees at SVSU who are a part of the athletic professionals group. Of the 20 employees, four are women and two are African–American. The group statistical data shows a goal of hiring six women and one African–American to the group. *See* Pl.'s Br. in Opposition to Def.'s Mot. S.J. Ex. 8.

Thompson testified that the 1996 SVSU Affirmative Action Plan was applicable to hiring decisions in 2001 and that he was responsible for enforcing the Plan. *See* Def.'s Mot. S.J. Ex. G, dep. of Richard Thompson at 21–22. The defendants argue that there is no evidence that anyone involved in the decision to hire Jerome Foster, including Richard Thompson, relied on the Affirmative Action Plan in making the hiring decision. Thompson testified in his deposition that during the course of the entire hiring process of selecting someone to fill the vacant Coordinator of Campus Recreation position, he did not refer to the Plan and, although he saw the Plan when it was initially adopted, he did not know that SVSU had a goal of hiring one African–American individual into the "Athletics Professionals" group, and he was not aware of the meaning or the significance of the statistical data contained in the appendix to the Plan. Thompson also testified that he was never told by anyone at SVSU to give preference to minorities or women in hiring decisions and never asked Mr. Buschlen or his other subordinates to provide him with reports regarding the number of women and minorities working in the various departments he oversaw.

Buschlen testified that he was also aware of the existence of SVSU's Affirmative Action Plan, but never read it. *See* Def.'s Mot. S.J. Ex. C, dep. of Eric Buschlen at 30. He also stated that SVSU never told him to give minorities or women preferential treatment. *Id.* at 35. Vogl likewise testified that SVSU never told him to give preference to minorities or women when hiring new employees. *See* Def.'s Mot. S.J. Ex. H, dep. of Joseph Vogl at 26. In fact, Buschlen testified that his only contact with the SVSU Office of Multicultural Programs and Affirmative Action with regard to the Coordinator of Campus Recreation position occurred when he first opened the search to fill the vacancies. Standard SVSU hiring practice requires that the affirmative action office be notified when a department on campus begins to conduct a search to fill a vacant position. Buschlen informed the office that his department was seeking to fill the vacant Coordinator of Campus Recreation position, but he testified that the office did not become involved in the process and did not ask to be further notified.

On January 7, 2003, the plaintiff filed her compliant in this Court against SVSU and Richard Thompson alleging that she was the victim of illegal discrimination. The plaintiff amended her complaint on March 10, 2003, which now asserts claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 against defendant Thompson for denial of equal protection of laws and discrimination on account of race in forming contracts; race discrimination under Michigan's Elliot Larsen Civil Rights Act, Mich. Comp. Laws § 37.2202, against defendant SVSU; and declaratory and injunctive relief under Article 1, § 2 of the Michigan Constitution against both defendants.

On September 16, 2003, the defendants filed their motion for summary judgment.

On October 3, 2003, pursuant to a stipulation of the parties, the Court granted the defendants leave to file a supplemental motion for summary judgment to assert their claim that the plaintiff's state law claims against SVSU are barred by the Eleventh Amendment. The supplemental motion was filed on October 9, 2003. The plaintiff answered the motion on October 27, 2003, and the defendants replied on November 11, 2003.

## II.

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson*, 477

U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons–Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir.2000). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir.1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir.1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts." ' " *Highland Capital, Inc. v. Franklin Nat. Bank,* 350 F.3d 558, 564 (6th Cir.2003) (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 800 (6th Cir.1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505) (internal quote marks omitted).

### A.

■ Count I of the plaintiff's first amended complaint alleges race discrimination against defendant Thompson pursuant to 42 U.S.C. § 1983 and Count III alleges race discrimination against Thompson pursuant to 42 U.S.C. § 1981. Under 42 U.S.C. § 1983, the plaintiff must establish that a person acting under color of state law deprived her of a right secured by the Constitution or laws of the United States. *Berger v. City of Mayfield Heights,* 265 F.3d 399, 405 (6th Cir.2001); *Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir.1999). Section 1983 is not itself a source of substantive rights; rather, it provides a vehicle for vindicating rights provided by the Constitution. *Braley v. City of Pontiac,* 906 F.2d 220, 223 (6th Cir.1990). Title 42, Section 1981 of the United States Code prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors. *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 867–68 (6th Cir.2001). The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

The Sixth Circuit has counseled district courts analyzing claims relating to employment discrimination that are brought under both statutes to rely on Title VII cases for guidance. *See Weberg v. Franks,* 229 F.3d 514, 522 (6th Cir.2000) (noting that "[b]ecause both Title VII and § 1983 prohibit discriminatory employment practices by public employers, this court looks to Title VII disparate treatment cases for assistance in analyzing race discrimination in the public employment context under § 1983") (citations omitted); *Christian,* 252 F.3d at 868 (stating that "[t]his circuit has held that to prevail in a claim of race discrimination under § 1981 relying on circumstantial evidence, a plaintiff must meet the burden-shifting standard of proof for Title VII cases").

■ The analytical framework governing Title VII cases is well-established. The plaintiff can prove a case of reverse discrimination by offering direct evidence that race was a substantial factor in the employment decision. *See Weberg,* 229 F.3d at 522 (holding that under Title VII and Section 1983, "a plaintiff is required to demonstrate that the adverse employment decision would not have been made 'but for' her race"). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ibid.* (internal quotes

omitted); *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). It does not require the fact finder to draw any inferences to reach that conclusion. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000).

█ Alternatively, the plaintiff can meet her evidentiary burden through circumstantial evidence. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). To prevail under this framework, a plaintiff must present a *prima facie* case, at which point the defendant must come forward with a legitimate, non-discriminatory reason for its action. If the defendant is able to offer such a reason for the adverse employment action, the plaintiff must offer evidence that the defendant's justification is a pretext that masks its true discriminatory intent. *See Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003).

█ To make out a *prima facie* case of discrimination based upon a failure to hire for a vacant position, a plaintiff must show: (1) that she is a member of a protected class; (2) that she applied and was qualified for the position; (3) that she was considered for and denied the position; and (4) another applicant with similar qualifications who was not a member of the protected class was hired for the position. *See Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir.2003); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020–21 (6th Cir.2000) (quoting *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir.1985) (quoting *Parker v. Baltimore and Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981))). *See also Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 255 (6th Cir.2002) (ex-

plaining in the context of a conventional racial discrimination case that "to establish a *prima facie* case of race discrimination, the plaintiff must demonstrate four things: (i) he is a member of a racial minority; (ii) he was qualified for the position he was seeking; (iii) despite his qualifications, he was rejected; and (iv) after his rejection, the position remained open and the employer sought applicants from persons of complainant's qualifications").

█ "The Sixth Circuit has adapted this four-prong test to cases of reverse discrimination, where a member of the majority is claiming discrimination on the basis of race." *Sutherland*, 344 F.3d at 614. "In such cases, to satisfy the first prong of the *prima facie* case, the plaintiff must demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Ibid* (citations and quotations omitted). "To establish such background circumstances, the plaintiff can [offer proof that] evidence of the defendants' unlawful consideration of race as a factor in hiring in the past justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely." *Zambetti*, 314 F.3d at 256 (citations and quotations omitted). "To satisfy the fourth prong in such cases, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Sutherland*, 344 F.3d at 614; *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 (6th Cir.1994). To demonstrate that the plaintiff and minority applicants were similarly situated, the plaintiff must "prove that *all* of the relevant aspects of [her] employment situation were *nearly identical* to those of [the minority applicant's] employment situation." *Pierce*, 40 F.3d at 802 (emphasis added). In identifying the factors to be

considered in making this determination, this Court "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of [the successful applicant]." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998). If the plaintiff cannot produce facts supporting each element of the *prima facie* case, then the defendants are entitled to summary judgment. *Pierce,* 40 F.3d at 801 n. 7.

■ As mentioned, once the plaintiff establishes a *prima facie* case, the burden shifts to the defendants to offer a legitimate, non-discriminatory reason for the adverse employment action at issue. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). If the defendants offer such evidence, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext. *Ibid.* (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817). A plaintiff can demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson,* 319 F.3d at 866.

### 1.

■ The plaintiff argues that the existence of SVSU's affirmative action plan itself constitutes direct evidence of discrimination and satisfies her burden under Title VII, and therefore under Sections 1981 and 1983 as well, at the summary judgment stage of the proceedings. Although there is no Sixth Circuit case directly on point, the plaintiff points to *Bass v. Board of County Commissioners, Orange County, Fla.,* 242 F.3d 996 (11th Cir.2001), as support for her claim. The court's opinion in that case was later vacat-

ed and superseded on rehearing, *see* 256 F.3d 1095 (11th Cir.2001), but the new decision does provide guidance. The court noted that "[t]he mere existence of an affirmative action plan by itself does not constitute direct evidence of discrimination unless there is also evidence that the employer acted pursuant to the plan in making employment decisions.... However, the existence of an affirmative action plan, when combined with evidence that the plan was followed in an employment decision, is sufficient to constitute direct evidence of unlawful discrimination unless the plan is valid." *Id.* at 1110.

■ The defendants do not attempt here to argue that their affirmative action plan is "valid." Rather, they insist that it played no role in their choice among the candidates for the Coordinator of Campus Recreation position. Indeed, Richard Thompson testified that he did not refer to the plan in selecting Mr. Foster to fill the position and that other officials at SVSU never told him to refer to the plan when making his decision to hire someone for the position. *See* Def.'s Mot. S.J. Ex. G, dep. of Richard Thompson at 21–26, 51. At oral argument, the plaintiff contended that direct evidence could be found in the existence of the plan coupled with Thompson's knowledge of its existence, the racial preferences it promoted, and the apparent departure from normal hiring practices, i.e., the failure to return to the candidate list when the top choices declined offers of employment. This argument is somewhat paradoxical, however, in that it suggests that the Court ought to *infer* the existence of direct evidence of discrimination from the circumstances outlined by the plaintiff. However, for the plaintiff to prove her case using direct evidence of discrimination, she cannot rely on the fact finder to draw any inferences to reach the conclusion that race discrimination was the moti-

vation behind the hiring decision. *See Nguyen,* 229 F.3d at 563.

 The Court agrees with the Eleventh Circuit and holds that the existence of an affirmative action plan standing alone does not constitute direct evidence of discrimination. Rather, to have any probative force, there also must be evidence that the plan was followed by the employer in making the employment decision. Here, there is no evidence that Thompson or SVSU acted pursuant to its affirmative action plan in declining to hire the plaintiff for the Coordinator of Campus Recreation position. The plaintiff has not created a genuine issue of material fact through direct evidence supporting her discrimination claims.

### 2.

The plaintiff also places heavy reliance on the existence of the affirmative action plan to support her argument that circumstantial evidence of racial discrimination exists on this record. She insists that the plan itself is sufficient to establish background circumstances that demonstrate that the defendant is the unusual employer that discriminates against the majority on the basis of race. The plaintiff cites *Taxman v. Bd. of Educ. of Piscataway Twp.,* 91 F.3d 1547, 1558–59 (3d Cir.1996), *Comiskey v. Automotive Industry Action Group,* 40 F.Supp.2d 877, 892–93 (E.D.Mich.1999), and *Lanphear v. Prokop,* 703 F.2d 1311, 1315 (D.C.Cir.1983), as establishing that proposition, but a careful reading of those decisions indicates that they do not lend support to the plaintiff's argument.

In *Taxman,* the United States brought an action under Title VII challenging a school board's affirmative action plan of preferring minority teachers over non-minority teachers in layoff decisions where the teachers were equally qualified. The Third Circuit held that the board's plan violated Title VII because it was adopted for the purpose of promoting racial diversity, rather than to remedy discrimination or effects of past discrimination. *Taxman,* 91 F.3d at 1558. The court's holding focused on the validity of the affirmative action plan itself, not whether it constituted circumstantial evidence of reverse race discrimination by itself or in combination with the other evidence in the case. In fact, the parties in that case conceded that a *prima facie* case had been established, and that "[t]he dispositive liability issue . . . is the validity of the [School] Board's [affirmative action] policy under Title VII." *Id.* at 1556.

*Comiskey* was a reverse discrimination case based on gender and did not involve an affirmative action plan at all. The case merely contains a parenthetical reference to the fact that "background circumstances" might be established if the plaintiff could show that employment decisions were "grounded in an affirmative action program." *Comiskey,* 40 F.Supp.2d at 893 (referring to *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir. 1985)).

The D.C. Circuit found that the plaintiff established a *prima facie* case of reverse discrimination in *Lanphear,* but the evidence consisted of considerably more than the existence of an affirmative action plan. The court in that case cogently explained the rationale for requiring proof of "background circumstances" in order to infer illegal discrimination when a member of the majority race is passed over for a job. The court noted that the inferential assumptions inherent in the *McDonnell Douglas* analytical framework do not carry over when the person claiming discrimination is not a member of a minority group. "Membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was

predicated, for only in that context can it be stated as a general rule that the 'light of common experience' would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member." *Lanphear*, 703 F.2d at 1315. It is beyond question that Title VII protects Caucasian employees, but it "defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society." *Ibid.* Therefore, a majority employee "must show that he 'was rejected under circumstances which [despite his majority status] give rise to an inference of unlawful discrimination.'" *Ibid.* (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). In *Lanphear*, those background circumstances included evidence that the plaintiff was "amply qualified" for the position, which he had been filling on an acting basis; he was "passed over" for a position "in favor of a black male" whose qualifications were not fully reviewed by the decision maker; and the federal agency employer "was under pressure from its head to increase the percentage of minority employees and was in the process of adopting an affirmative action plan." *Lanphear*, 703 F.2d at 1315. The case does not support the argument that an affirmative action plan by itself furnishes the "background circumstances" that establish the necessary evidential inference.

■■ The Court disagrees with the premise that an affirmative action plan alone is sufficient to establish the background circumstances necessary to prove the first element of a *prima facie* case of reverse discrimination. An affirmative action plan may contribute to the complex of circumstantial evidence that establishes that race was a substantial factor in past hiring decisions amounting to "capricious discrimination" against non-minority job applicants. But unless there is some evidence that the plan was actually implemented, or that it held sway over the decision maker, it cannot give rise to the suspicion of intentional discrimination.

■ In this case, the plaintiff argues that the affirmative action plan does not stand alone to support her case, but that it must be viewed in conjunction with the evidence that she was more qualified than the minority candidate that was ultimately hired. However, the minority candidate did not emerge until the second round of the search process, in which the plaintiff did not participate. The defendants asserted that they did not turn back to the original pool when none of its finalists were actually hired because the search committee had already sent out rejection letters to those applicants. That fact stands unrebutted on this record. The plaintiff's competition were the applicants in the first round pool; to discern whether there is circumstantial evidence of discrimination, the Court must focus on defendants' conduct at that stage of the process. The record shows that the plaintiff was rejected in favor of three finalists consisting of a Caucasian female with a Master's degree who was the intramural coordinator at a university in New Hampshire; a Caucasian male who was working for the YMCA in Bay City, Michigan; and a Caucasian male who was working for the City of Saginaw's community recreation coordinator. Not only does this list of top qualifiers belie an inference of discrimination on the basis of race, but it suggests that the affirmative action policy played no role in the selection process.

The plaintiff has not offered any evidence that the defendants' failure to hire one of these top candidates was a pretext for discrimination against Caucasian job applicants, or that the press of time was the true reason for changing the search

methodology in the second phase of the hiring process. Nonetheless, she insists that the person ultimately hired did not meet the job qualifications. However, it is undisputed that Mr. Foster holds a Bachelor's degree in business administration and had more experience running intramural programs than the plaintiff.

The Court finds that the plaintiff has not satisfied her burden of proving a *prima facie* case because she has not offered evidence of background circumstances that support an inference of unlawful discrimination against the majority race. Nor has she shown that the defendants "treated differently employees who were similarly situated but were not members of the protected class." *Sutherland*, 344 F.3d at 614.

■■■ Even if the plaintiff's evidence were sufficient to establish a *prima facie* case, however, the defendants have satisfied their burden of proving a legitimate, non-discriminatory reason for their actions. As the defendants point out, after two offers were made and rejected from the original three finalists, Thompson decided to refocus and redirect the search to recent SVSU graduates because of the entry level nature of the position, relatively low pay, and non-traditional hours. This decision to focus less on academic background and professional experience and more on direct experience in campus intramurals was a legitimate, non-discriminatory reason which ultimately led to the decision to hire Jerome Foster and not anyone from the original applicant pool, including the plaintiff.

The plaintiff has not presented any evidence that Thompson's decision to change the search methodology was a pretext for reverse discrimination. The plaintiff's application was rejected before that decision was made, and there is no suggestion in this record that the need to refocus the job search toward applicants with practical experience in intramural programs had no basis in fact, did not actually motivate the defendants' challenged conduct, or was insufficient to warrant the challenged conduct.

The Court concludes, therefore, that the plaintiff has not brought forth circumstantial evidence sufficient to created a genuine issue of material fact on the ultimate question of whether race was a substantial factor in the defendants' hiring decisions.

### B.

■■■ The defendants argue that SVSU also is entitled to judgment as a matter of law with regard to the plaintiff's race discrimination claim under the Elliott Larsen Civil Rights Act because the plaintiff cannot establish a *prima facie* case of reverse race discrimination under Michigan law. Michigan's Elliot–Larsen Civil Rights Act, under which the plaintiff has brought her claim against SVSU, prohibits an "employer" from "fail[ing] or refus[ing] to hire or recruit, discharge, or otherwise discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race." Mich. Comp. Laws § 37.2202(1)(a). As is the case under federal civil rights statutes, the elements of a civil rights claim under Michigan law may be proved by direct or circumstantial evidence, *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462, 628 N.W.2d 515, 520 (2001), and Michigan courts frequently "turn to federal precedent for guidance in reaching [their] decision" to determine whether a claim has been established in discrimination cases. *Radtke v. Everett*, 442 Mich. 368, 382, 501 N.W.2d 155, 162 (1993) (quoting *Sumner v. Goodyear Tire and Rubber Co.*, 427 Mich. 505, 525, 398 N.W.2d 368, 376 (1986)). For analytical purposes, Michi-

gan's Elliott–Larsen Act resembles federal law, and the same evidentiary burdens prevail as in the analogous Federal Civil Rights Act cases. *See Hazle,* 464 Mich. at 462, 628 N.W.2d 515; *Jenkins v. Southeastern Mich. Chapter, Am. Red Cross,* 141 Mich.App. 785, 793 n. 2, 369 N.W.2d 223, 227 n. 2 (1985); *Gallaway v. Chrysler Corp.,* 105 Mich.App. 1, 4–5, 306 N.W.2d 368, 370–71 (1981).

The Court has determined that the plaintiff has not offered sufficient direct or circumstantial evidence to survive a motion for summary judgment on her reverse discrimination claims brought under 42 U.S.C. §§ 1981 and 1983, which in turn are based on the analysis used in Title VII cases. The Court finds that the plaintiff's claim under the Elliott–Larsen Act must fail as well.

The defendants lastly contend that they are entitled to judgment as a matter of law with regard to the plaintiff's claim for declaratory and injunctive relief under the equal protection clause in the Michigan constitution, Const. 1963 Art.1, § 2. That provision states:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

Mich. Const. art. I, § 2. This section of the Michigan constitution offers similar protection to the federal Equal Protection Clause. *See Harville v. State Plumbing & Heating, Inc.,* 218 Mich.App. 302, 553 N.W.2d 377 (1996). Under both federal and state law, it has been held that the Equal Protection Clause "reaches only intentional or purposeful conduct." *Id.* at 306, 553 N.W.2d at 379.

Although Article 1, § 2 is not self-implementing against private parties, *see Pacheco v. Clifton,* 109 Mich.App. 563, 576, 311 N.W.2d 801, 807 (1981), *modified on other grounds,* 420 Mich. 308, 362 N.W.2d 642 (1984), the Michigan courts have held that this section of the Michigan Constitution is self-implementing against governmental entities. *See Detroit Branch, N.A.A.C.P. v. City of Dearborn,* 173 Mich.App. 602, 613–14, 434 N.W.2d 444, 449 (1988) ("We find that, like all the other provisions of the Michigan Constitution protecting individual rights, art. 1, § 2 does not require implementing legislation in order to operate as a limitation on the exercise of governmental power."). Furthermore, it has been held that, "[i]n the absence of a purpose to cause racial discrimination, governmental action that has a disproportionate effect on a racial minority is not unconstitutional" under the state or federal equal protection clause. *People v. Ford,* 417 Mich. 66, 103, 331 N.W.2d 878, 892 (1982); *see Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "Rather, in such cases, a racially discriminatory purpose underlying the governmental activity must be shown before unconstitutionality may be declared." *Detroit Branch, N.A.A.C.P.,* 173 Mich.App. at 614, 434 N.W.2d at 449.

Because the plaintiff has not proven that there was a racially discriminatory purpose underlying SVSU's activity in not hiring her for the Coordinator of Campus Recreation position, she has likewise failed to furnish factual support for her Michigan constitutional claim sufficient to withstand summary judgment. There is no need, therefore, to address SVSU's alternative argument that the Eleventh Amendment bars suit against it in federal court.

### III.

The plaintiff has not come forward with evidence to create a jury-subvisible issue

on the question of whether race was a significant factor in the defendants' decision not to hire the plaintiff as the coordinator of campus recreation. The plaintiff, therefore, has not made out a claim under any federal or state law theory proscribing discrimination in hiring or employment.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt # 17] is **GRANTED**.

It is further **ORDERED** that the plaintiff's complaint is **DISMISSED WITH PREJUDICE.**